Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/09/2016 09:08 AM CDT

STATE OF NEBRASKA, APPELLEE, V.
ERICA A. JENKINS, APPELLANT.
___ N.W.2d ___

Filed September 9, 2016.    No. S-14-1087.

1. **Criminal Law: Federal Acts: Records.** Under 18 U.S.C. § 2703(d) (2012), the government may obtain a court order that requires a cellular service provider to disclose a customer's records upon a showing that specific and articulable facts showing that there are reasonable grounds to believe the information sought is relevant and material to an ongoing criminal investigation.

2. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

3. **Constitutional Law: Search and Seizure.** The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution protect individuals against unreasonable searches and seizures by the government. These constitutional provisions do not protect citizens from all governmental intrusion, but only from unreasonable intrusions.

4. **Constitutional Law: Search and Seizure: States.** The Fourth Amendment's protections are implicated whenever state action intrudes on a citizen's reasonable expectation of privacy.

5. **Constitutional Law: Search and Seizure.** Determining whether a reasonable expectation of privacy exists normally involves answering two inquiries: first, whether the individual has exhibited an actual (subjective) expectation of privacy, and, second, whether the individual's expectation is one that society is prepared to recognize as "reasonable."

6. ____: ____. For purposes of the Fourth Amendment, a search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.

7. **Constitutional Law.** Under the third-party doctrine, there is no reasonable expectation of privacy in personal information a defendant knowingly exposes to third parties. This is true even when the information is revealed to the third party on the assumption that it will be used only for a limited purpose and the confidence in the third party will not be betrayed.

8. **Constitutional Law: Records.** Cell phone users can claim no reasonable expectation of privacy in their service providers' business records documenting the cellular towers that route their calls.

9. **Constitutional Law: Federal Acts: Search and Seizure.** The State's acquisition of historical cell site location information pursuant to 18 U.S.C. § 2703(d) (2012) does not violate or implicate the Fourth Amendment and is not a search under either the U.S. or Nebraska Constitution.

10. **Trial: Photographs.** The admission of photographs of a gruesome nature rests largely with the discretion of the trial court, which must determine their relevancy and weigh their probative value against their prejudicial effect.

11. **Trial: Photographs: Appeal and Error.** An appellate court reviews the court's admission of photographs of the victims' bodies for abuse of discretion.

12. **Rules of Evidence.** Under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2008), relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice or if it is needlessly cumulative.

13. **Homicide: Photographs.** If the State lays proper foundation, photographs that illustrate or make clear a controverted issue in a homicide case are admissible, even if gruesome.

14. ____: ____. In a homicide prosecution, a court may admit into evidence photographs of a victim for identification, to show the condition of the body or the nature and extent of wounds and injuries to it, and to establish an element of the crime.

15. **Photographs: Rules of Evidence.** Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2008), does not require the State to have a separate purpose for every photograph.

16. ____: ____. Generally, when a court admits photographs for a proper purpose, additional photographs of the same type are not unfairly prejudicial.

17. **Evidence: Appeal and Error.** In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

18. **Robbery: Words and Phrases.** A person commits robbery if, with the intent to steal, he or she forcibly and by violence, or by putting in fear, takes from the person of another any money or personal property of any value whatever.

19. **Criminal Law: Motions for New Trial: Appeal and Error.** In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed.

20. **Prosecuting Attorneys: Pretrial Procedure: Evidence.** Under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the prosecution has a duty to disclose all favorable evidence to a criminal defendant prior to trial. Impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule.

21. **Judges: Motions for New Trial: Evidence: Witnesses: Verdicts.** A trial judge is accorded significant discretion in granting or denying a motion for new trial, because the trial judge sees the witnesses, hears the testimony, and has a special perspective on the relationship between the evidence and the verdict.

22. **Sentences: Appeal and Error.** An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.

23. **Statutes: Appeal and Error.** Statutory interpretation presents a question of law, for which an appellate court has an obligation to reach an independent conclusion irrespective of the determination made by the court below.

24. **Sentences: Prior Convictions: Habitual Criminals: Proof.** In a habitual criminal proceeding, the State's evidence must establish with requisite trustworthiness, based upon a preponderance of the evidence, that (1) the defendant has been twice convicted of a crime, for which he or she was sentenced and committed to prison for not less than 1 year; (2) the trial court rendered a judgment of conviction for each crime; and (3) at the time of the prior conviction and sentencing, the defendant was

represented by counsel or had knowingly and voluntarily waived representation for those proceedings.

25. **Criminal Law: Habitual Criminals.** To warrant enhancement under the habitual criminal statute, Neb. Rev. Stat. § 29-2221 (Reissue 2008), the prior convictions, except the first conviction, must be for offenses committed after each preceding conviction, and all such prior convictions must precede the commission of the principal offense.

26. **Criminal Law: Convictions: Habitual Criminals.** Where the sequence of prior convictions is in issue, the rule is that each successive felony must be committed after the previous felony conviction in order to count toward habitual criminal status.

27. **Sentences: Prior Convictions: Habitual Criminals.** So long as each successive felony is committed after the previous felony conviction, it is immaterial to the habitual criminal analysis that an offender has not yet finished serving his or her sentence on the previous felony.

Appeal from the District Court for Douglas County: Peter C. Bataillon, Judge. Affirmed.

Beau G. Finley, of Finley & Kahler Law Firm, P.C., L.L.O., and Sean M. Conway, of Dornan, Lustgarten & Troia, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Stacy M. Foust for appellee.

Heavican, C.J., Wright, Connolly, Miller-Lerman, Cassel, and Stacy, JJ., and Moore, Chief Judge.

Stacy, J.

## I. SUMMARY OF CASE

Following a jury trial, Erica A. Jenkins was convicted of two counts of robbery. She was sentenced to consecutive terms of 30 to 50 years' imprisonment. This is her direct appeal.

Several issues are assigned as error, but the primary issue presented is whether the State's acquisition of Jenkins' cell phone records from her service provider amounted to a search under the U.S. and Nebraska Constitutions. We find Jenkins had no reasonable expectation of privacy in these records, and

we conclude the State's acquisition of those records was not a search implicating the Fourth Amendment. We find no merit to Jenkins' remaining assignments of error, and we affirm her convictions and sentences.

## II. FACTS

On August 11, 2013, the bodies of two men were found in a pickup truck near a park in Omaha, Nebraska. The men had each been shot in the head, the pockets in their pants had been turned inside out, and their wallets were missing. The men were later identified as Juan Uribe-Pena and Jorge Cajiga-Ruiz.

A palmprint found on the pickup truck led police to Christine Bordeaux, who was the State's main witness at trial. Bordeaux testified that on the evening of August 10, 2013, Jenkins' brother, Nikko Jenkins (Nikko), suggested a plan for Bordeaux and Jenkins to lure men to a place where Nikko would rob them. According to Bordeaux, she and Jenkins agreed to "hit a lick" or "go do a robbery" with Nikko. When asked at trial whether she had any doubt that Jenkins knew the entire night "was about getting money and robbing guys," Bordeaux responded, "There's no doubt, no."

Bordeaux testified that she and Jenkins left with Nikko that night and that he drove them to an Omaha bar. Nikko dropped the women off and parked nearby. The women were approached by some men in a pickup truck who asked whether the women "wanted to party." Bordeaux and Jenkins got into the pickup, and the men drove them to an Omaha apartment. Once inside the apartment, Bordeaux asked the men whether they had any money. One of the men told her not to worry, "he was gonna have another friend come and bring his money, possibly up to $1,000." Jenkins then went into the bathroom to call Nikko on her cell phone. About 30 minutes later, Bordeaux and Jenkins left the apartment with two of the men to buy more alcohol and pick up another woman. Bordeaux testified she wanted to "get them out of the apartment" and

"go to the store . . . so Nikko could rob 'em." They left the apartment in a white pickup truck driven by one of the men. Bordeaux rode in the front passenger seat of the pickup, and Jenkins sat immediately behind her. Nikko followed the pickup in another vehicle.

When the pickup stopped at the end of a road near a park, Nikko approached with a gun and knocked on a window of the pickup. Bordeaux and Jenkins got out of the pickup. Nikko then demanded money from the men, shot them, and took their wallets. According to Bordeaux, Nikko first shot the man in the back seat and then shot the driver, who had moved over to the passenger side of the pickup when he saw Nikko. After the second shot, Jenkins screamed and ran. Bordeaux and Jenkins waited in Nikko's car while he gathered the shell casings. Nikko eventually returned to the car carrying two wallets and two shell casings.

After the shootings, Nikko drove Bordeaux and Jenkins to a motel in Council Bluffs, Iowa, so they could switch vehicles and change clothes. According to Bordeaux, after they changed clothes, she and Nikko waited in the motel parking lot in another vehicle while Jenkins tried to fix the taillights on her vehicle. When a police cruiser pulled into the motel parking lot, Nikko and Bordeaux drove away.

A Council Bluffs police officer testified he was patrolling the motel parking lot at about 3:40 a.m. and contacted a black female in a vehicle registered to Jenkins. She told the officer she was having car trouble and explained her cousin had just pulled out of the parking lot in another vehicle.

A cell phone found under the body of one of the victims led police to Jose Oscar Ramirez-Martinez. Ramirez-Martinez testified he was with the two victims, Uribe-Pena and Cajiga-Ruiz, at an Omaha bar a few hours before the shooting. According to Ramirez-Martinez, he and the two victims met two women at the bar and eventually left with the women to go to Uribe-Pena's apartment. Ramirez-Martinez described one woman as "white" and "blonde" and the other as "dark" and

"thin." He testified the thin woman went into the bathroom upon arriving at the apartment. Ramirez-Martinez testified he was in the apartment about 10 minutes before leaving to get more money. After leaving the apartment, Ramirez-Martinez received a call from Uribe-Pena telling him they were driving with the women to find another female friend. Ramirez-Martinez tried calling Uribe-Pena several times after that, but received no answer. He later learned Uribe-Pena and Cajiga-Ruiz had been killed.

Eventually, Jenkins was arrested and charged with two counts of robbery and one count of criminal conspiracy. The information also alleged Jenkins was a habitual criminal. In a separate case, Nikko was charged with, and convicted of, two counts of first degree murder in connection with the deaths of Uribe-Pena and Cajiga-Ruiz.

After her arrest, Jenkins disclosed her cell phone number to police. Police then obtained, from Jenkins' cellular service provider, certain cell phone records associated with that number. The records included subscriber information and user activity for connections to and from the account around the time of the crime, including records regarding cellular site and sector information. Police did not request or obtain production of the content of any communications or files stored for the account.

The cell phone records showed that calls involving Jenkins' cell phone occurred at 1:33, 1:54, and 2:09 a.m. and were routed through a cell tower one block from Uribe-Pena's apartment. A call from Jenkins' cell phone at 2:17 a.m. was routed through a cell tower near the crime scene. And multiple calls from Jenkins' cell phone made between 3:46 and 3:53 a.m. were routed through a cell tower located in Council Bluffs. As such, the records provided evidence that Jenkins' cell phone was near the crime scene during the relevant timeframe and provided evidence that corroborated witness testimony of Jenkins' whereabouts before and after the crime occurred.

Prior to trial, Jenkins moved to suppress the cell phone records. She argued the State obtained the records pursuant to a search warrant that was not supported by probable cause and thereby violated her rights under the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution. The district court held a hearing on the motion and took the matter under advisement.

The next day, while the suppression motion was still under advisement, the State obtained another search warrant for the same cell phone records, this time supported by an affidavit which more precisely described Jenkins' involvement and her use of the cell phone at the time of the crimes. The cellular service provider again produced the requested cell phone records, and Jenkins filed a supplemental motion to suppress. At the hearing on the supplemental motion, Jenkins did not argue the affidavit supporting the second search warrant lacked probable cause, but instead argued the State had impermissibly supplemented its affidavit.

The district court denied both the original and supplemental motions to suppress. The court relied on our opinion in *State v. Knutson*[1] to find that Jenkins had no reasonable expectation of privacy in the cell phone records and thus concluded police did not conduct a search implicating the Fourth Amendment when officers obtained the records. Alternatively, the district court found that even if a search under the U.S. and Nebraska Constitutions occurred, the second search warrant was supported by probable cause.

Following a jury trial, Jenkins was found guilty of two counts of robbery. The jury could not reach a unanimous verdict on the separate count of criminal conspiracy. After an enhancement hearing at which the court found Jenkins to be a habitual criminal, she was sentenced to consecutive prison terms of 30 to 50 years on each robbery count. Jenkins timely

---

[1] *State v. Knutson*, 288 Neb. 823, 852 N.W.2d 307 (2014).

appealed, and we granted her petition to bypass the Nebraska Court of Appeals.

### III. ASSIGNMENTS OF ERROR

Jenkins assigns, rephrased, that (1) the district court erred in overruling her motion to suppress the cell phone records, (2) the district court erred in admitting gruesome photographs, (3) the district court erred in overruling her motion for new trial, (4) the evidence at trial was insufficient to support her convictions, and (5) the district court erred in finding her to be a habitual criminal.

### IV. ANALYSIS

#### 1. Motion to Suppress Cell Phone Records

##### (a) Background

[1] In this case, police relied on the federal Stored Communications Act[2] to request and obtain Jenkins' cell phone records. Under the federal act, the government may obtain a court order that requires a cellular service provider to disclose a customer's records upon a showing that "specific and articulable facts showing that there are reasonable grounds to believe [the information sought is] relevant and material to an ongoing criminal investigation."[3] Section 2703(d) does not require the government to show probable cause in connection with obtaining a court order.[4]

Here, the parties and the district court consistently refer to the § 2703(d) order used to obtain the cell phone records as a "search warrant," but it is more properly characterized as a court order. Using the language of § 2703(d), the district court made a finding that "the applicant has offered specific and articulable facts showing that there are

---

[2] 18 U.S.C. §§ 2701 to 2711 (2012).

[3] § 2703(d).

[4] See *U.S. v. Davis*, 785 F.3d 498 (11th Cir. 2015) (en banc), *cert. denied* ___ U.S. ___, 136 S. Ct. 479, 193 L. Ed. 2d 349.

reasonable grounds to believe that the records . . . sought are relevant and material to an ongoing criminal investigation." The court then compelled the cellular service provider to produce the cell phone records using the following language: "**YOU ARE, THEREFORE, ORDERED,** pursuant to Title 18, United States Code, Section 2703(d)[, to] turn over to the Omaha, Nebraska Police Department the records and other information [requested]." As such, although the Stored Communications Act authorizes governmental entities to obtain cell phone records using either warrants[5] or court orders,[6] the records in this case were obtained using a court order issued pursuant to § 2703(d).

On appeal, Jenkins does not argue that the court orders obtained by police failed to satisfy the statutory requirements of the Stored Communications Act. Rather, she argues that her rights under the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution were violated when her cell phone records were obtained by police. Jenkins argues she has an expectation of privacy in the cell phone records and contends the affidavit supporting the first "warrant" lacked probable cause. Jenkins concedes the second "warrant" was supported by an affidavit which recited probable cause, but argues the affidavit was impermissibly rehabilitated.

In response, the State argues Jenkins did not have a reasonable expectation of privacy in the cell phone records, so officers did not conduct a search subject to Fourth Amendment protection when they obtained the records. Alternatively, the State argues that even assuming officers conducted a search when they obtained the cell phone records, the second search warrant was supported by probable cause and the motion to suppress was properly overruled. The State further argues that the exclusionary rule does not apply in this case, because

---

[5] See § 2703(c)(1)(A).

[6] See § 2703(d).

either the good faith exception[7] applies, the independent source doctrine[8] applies, or the inevitable discovery doctrine[9] applies.

### (b) Standard of Review

[2] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review.[10] Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.[11]

### (c) Analysis

[3] Both the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution protect individuals against unreasonable searches and seizures by the government.[12] These constitutional provisions do not protect citizens from all governmental intrusion, but only from unreasonable intrusions.[13] Here, the threshold question is whether the State's acquisition of Jenkins' cell phone records amounted to a search or seizure under the U.S. and Nebraska Constitutions. Jenkins does not argue that Nebraska's constitutional provisions impose any higher standard than the

---

[7] See, *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984); *State v. Sprunger*, 283 Neb. 531, 811 N.W.2d 235 (2012); *State v. Nuss*, 279 Neb. 648, 781 N.W.2d 60 (2010).

[8] See *State v. Oliveira-Coutinho*, 291 Neb. 294, 865 N.W.2d 740 (2015).

[9] See *State v. Ball*, 271 Neb. 140, 710 N.W.2d 592 (2006).

[10] *State v. Tyler*, 291 Neb. 920, 870 N.W.2d 119 (2015); *State v. Hedgcock*, 277 Neb. 805, 765 N.W.2d 469 (2009).

[11] *Id.*

[12] *State v. Knutson, supra* note 1.

[13] *State v. Smith*, 279 Neb. 918, 782 N.W.2d 913 (2010).

Fourth Amendment, and we analyze her claims under familiar Fourth Amendment principles.

[4-6] The Fourth Amendment's protections are implicated whenever state action intrudes on a citizen's reasonable expectation of privacy.[14] Determining whether a reasonable expectation of privacy exists normally involves answering two inquiries: first, whether the individual has exhibited an actual (subjective) expectation of privacy, and, second, whether the individual's expectation is one that society is prepared to recognize as "reasonable."[15] As such, for purposes of the Fourth Amendment, a "search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable."[16]

Before addressing whether Jenkins has a reasonable expectation of privacy in her cell phone records, we pause to clarify the nature of the records sought and produced in this case.[17] The court orders compelled the cellular service provider to turn over subscriber information and records of user activity for connections made to and from the account, including "caller identification records" and the "cellular site and sector guide" for the prior 30-day period. As such, the court orders compelled production of what is commonly referred to as "historical cell site location information" (CSLI). The court orders did not compel production of the content of any communications involving the cell phone, and nothing in our record suggests any content-based information was provided. Nor did the historical CSLI allow law enforcement to track Jenkins' use of her cell phone prospectively or in real time.

---

[14] *State v. Knutson, supra* note 1.

[15] *Smith v. Maryland*, 442 U.S. 735, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979).

[16] *Kyllo v. United States*, 533 U.S. 27, 33, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001).

[17] See *Smith v. Maryland, supra* note 15, 442 U.S. at 741 (in deciding whether the Fourth Amendment applies, "it is important to begin by specifying precisely the nature of the state activity that is challenged").

At the hearing on the motion to suppress, the records custodian for the cellular service provider testified that when a cell phone is used to make or accept calls or text messages, the service provider records the date and time of the transaction, the cell phone numbers involved, and the beginning and ending sector and cell tower site associated with the transaction. This information is recorded at or near the time of each transaction and is kept by the cellular service provider for all accounts in the regular course of its business. The service provider stores the CSLI in a database for 18 months.

Jenkins asks us to find she had a reasonable expectation of privacy in the cell phone records maintained by her service provider. We rejected a similar claim in *State v. Knutson*.[18]

In *Knutson*, the State used a subpoena to obtain the defendant's cell phone records from his service provider. The records showed the date and time of calls and text messages between the defendant and a minor he was accused of assaulting, but did not include the content of any communications. The defendant argued his rights under the Fourth Amendment were violated because the State obtained the records from his cellular service provider through a subpoena rather than a search warrant supported by probable cause.

To determine whether the Fourth Amendment was implicated, we considered whether the defendant in *Knutson* had a reasonable expectation of privacy in business records maintained by his service provider detailing the destination number and times for calls and text messages he sent and received. We applied the reasoning articulated by the U.S. Supreme Court in *Smith v. Maryland*.[19] There, the Court applied the third-party doctrine and held that law enforcement officers do not need a warrant to have a telephone company install a pen register to record the numbers dialed from a

---

[18] *State v. Knutson, supra* note 1.

[19] *Smith v. Maryland, supra* note 15.

person's telephone, because the activity does not amount to a search under the Fourth Amendment. The Court reasoned that each time a customer uses a telephone, he or she voluntarily conveys numerical information to the telephone company. By doing so, the customer assumes the risk that the company will reveal to police "the numbers dialed [and the] switching equipment that processed those numbers," which the Court described as "merely the modern counterpart of the operator who, in an earlier day, personally completed calls for the subscriber."[20]

In *Knutson*, we applied the third-party doctrine and found the defendant did not have a reasonable expectation of privacy in the cell phone records maintained by his service provider. And we concluded he had no Fourth Amendment claim when the government obtained those records using a subpoena, because there was no constitutional interest at stake.[21]

[7] Here, like in *Knutson*, we conclude the third-party doctrine governs our analysis. The U.S. Supreme Court has repeatedly said there is no reasonable expectation of privacy in personal information a defendant knowingly exposes to third parties.[22] And this is true even when the information is revealed to the third party on the assumption that it will be used only for a limited purpose and the confidence in the third party will not be betrayed.[23]

Applying the third-party doctrine to the facts of this case, we conclude Jenkins did not have a reasonable expectation

---

[20] *Id.*, 442 U.S. at 744.

[21] *State v. Knutson, supra* note 1.

[22] *State v. Wiedeman*, 286 Neb. 193, 835 N.W.2d 698 (2013), citing *Smith v. Maryland, supra* note 15; *United States v. Miller*, 425 U.S. 435, 96 S. Ct. 1619, 48 L. Ed. 2d 71 (1976); *Couch v. United States*, 409 U.S. 322, 93 S. Ct. 611, 34 L. Ed. 2d 548 (1973); *Hoffa v. United States*, 385 U.S. 293, 87 S. Ct. 408, 17 L. Ed. 2d 374 (1966); and *Lopez v. United States*, 373 U.S. 427, 83 S. Ct. 1381, 10 L. Ed. 2d 462 (1963).

[23] *Id.*, citing *United States v. Miller, supra* note 22.

of privacy in the historical CSLI maintained by her cellular service provider. Each time she sent or received a call or text message, her cellular service provider generated a record which included the date and time of the communication and the sector and cell tower sites used to route the communication. This historical CSLI was recorded and kept by the cellular service provider in the ordinary course of business. The government did not require Jenkins' service provider to record or store this information, and "[t]he fortuity of whether or not the [third party] in fact elects to make a quasi-permanent record" of information conveyed to it "does not . . . make any constitutional difference."[24]

In arguing that we should recognize a reasonable expectation of privacy on these facts, Jenkins claims the cell phone records stored by her service provider contain "far more than simply a call log," because "such information can be used to track [her] movements and location."[25] She points out the records were used at trial to provide evidence of her general location during the robbery and homicide. As such, she argues our analysis of the records should be governed by global position system (GPS) tracking cases such as *U.S. v. Jones*,[26] rather than by *Smith*.

In *Jones*, the FBI and local law enforcement secretly installed a GPS tracking device on a private vehicle and monitored the vehicle's movements for 28 days. The GPS device established the vehicle's location within 50 to 100 feet and communicated that location to a government computer. The *Jones* Court concluded that the government physically intruded on the defendant's private property to install the GPS device and that the government's use of that device to monitor the vehicle's movements constituted a search and violated the

---

[24] *Smith v. Maryland, supra* note 15, 442 U.S. at 745.

[25] Brief for appellant at 31.

[26] *U.S. v. Jones*, ___ U.S. ___, 132 S. Ct. 945, 181 L. Ed. 2d 911 (2012).

Fourth Amendment.[27] The Court highlighted the significance of the governmental activity involved, stating:

> It is important to be clear about what occurred in this case: The Government physically occupied private property for the purpose of obtaining information. We have no doubt that such a physical intrusion would have been considered a "search" within the meaning of the Fourth Amendment when it was adopted.[28]

But the present case does not involve the issue of government tracking, and the Court's analysis in *Jones* tells us little about whether the State's acquisition of business records containing historical CSLI from a cellular service provider is a search within the meaning of the Fourth Amendment. Unlike the GPS surveillance information collected by the government in *Jones*, the historical CSLI obtained in the present case is routinely collected by the service provider for all subscribers and enables only general conclusions to be drawn regarding the caller's location when calls and texts are sent and received. The historical CSLI in this case was not collected by the government, did not involve a physical intrusion on private property, and did not enable real-time tracking or permit prosecutors to place Jenkins at a precise location at any point in time.

It is worth mentioning that, given the landline technology of telephones at the time of *Smith*, the records obtained by the government in that case arguably contained more precise location data than the CSLI at issue here, because landlines are associated with a physical street address.[29] The fact that the business records in *Smith* showed exactly where the caller was (in his home) at the time the calls were placed did not preclude the Court from applying the third-party doctrine and

---

[27] *Id.*

[28] *Id.*, 132 S. Ct. at 949.

[29] See *U.S. v. Davis, supra* note 4.

concluding he had no reasonable expectation of privacy in the telephone records. Despite advances in technology, we see no compelling reason to depart from the third-party doctrine just because the business records at issue pertain to a customer's use of a cell phone rather than a landline telephone.

It is true that the technology used to route cell phone communications may act in some respects like a tracking device, but it is one which cellular customers knowingly and voluntarily carry and use, not one placed secretly on their person or property by the government. And the routing information from which general location information can later be gleaned is information recorded and kept by the service provider in the ordinary course of business, not at the behest of the government. These distinctions are significant.[30] Cases such as *Jones*, which analyze direct government surveillance using GPS technology, do not answer the question whether the government invades an individual's reasonable expectation of privacy when it obtains, from a third-party service provider, cell phone records which include historical CSLI from which the government can deduce general location information.[31]

Jenkins also argues that the U.S. Supreme Court's recent holding in *Riley v. California*[32] compels the conclusion that she has a reasonable expectation of privacy in her cell phone records. We disagree.

In *Knutson*, when determining whether a Fourth Amendment search occurs when the government obtains cell phone records from a third-party service provider, we expressly rejected the suggestion that this issue was controlled by cases involving

---

[30] See, *U.S. v. Graham*, 824 F.3d 421 (4th Cir. 2016); *U.S. v. Davis, supra* note 4; *In re U.S. for Historical Cell Site Data*, 724 F.3d 600 (5th Cir. 2013); *In re Electronic Communication Service to Disclose*, 620 F.3d 304 (3d Cir. 2010).

[31] *Id.*

[32] *Riley v. California*, ___ U.S. ___, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014).

searches of cell phones to obtain "*content* information.*"*[33] We adhere to this reasoning in the present case and see nothing in *Riley* which compels a different conclusion.

The Court in *Riley* phrased the question presented as whether the police may, without a warrant, search digital information stored on a cell phone seized from an individual who has been arrested. In *Riley*, the digital *contents* of cell phones had been searched by police incident to arrest, and the Court was required "to decide how the search incident to arrest doctrine applies to modern cell phones, which are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy."[34] The Court in *Riley* held that police generally may not, without a warrant, search the digital information stored on a cell phone seized from an individual who has been arrested.[35]

The U.S. Supreme Court's analysis in *Riley* is not particularly instructive here, because it pertains to governmental searches of a cell phone's *contents*. The present case does not involve such a search. The Court made a clear distinction in *Smith* between obtaining the *content* of communications and obtaining *noncontent* information that enables service providers to transmit a communication.[36] Here, the State did not acquire the CSLI records by searching the contents of Jenkins' cell phone, and the business records produced by the service provider did not include the content of any communications. So while *Riley* properly governs our analysis when police

---

[33] *State v. Knutson, supra* note 1, 288 Neb. at 836, 852 N.W.2d at 319 (emphasis supplied).

[34] *Riley v. California, supra* note 32, 134 S. Ct. at 2484.

[35] *Id.*

[36] *Smith v. Maryland, supra* note 15, 442 U.S. at 741 ("a pen register differs significantly from the listening device employed in *Katz* [*v. United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967)], for pen registers do not acquire the *contents* of communications") (emphasis supplied).

acquire the digital contents of an individual's cell phone,[37] it does not address whether the government conducts a search when it acquires noncontent business records containing historical CSLI from a person's cellular service provider.

[8,9] Instead, as stated previously, the third-party doctrine of *Smith* governs our analysis of the historical CSLI at issue in this case. Like the pen register information in *Smith*, the CSLI at issue here documents call routing information that was gathered and kept by the service provider in the ordinary course of business. These business records disclose only the "'"means of establishing communication"'" and not the contents of any communication.[38] And like the telephone customer in *Smith*, we conclude Jenkins can claim no reasonable expectation of privacy in her service provider's business records documenting the cell towers that routed her calls, because "[t]he switching equipment that processed [her calls] is merely the modern counterpart of the operator who, in an earlier day, personally completed calls for the subscriber."[39] We hold the State's acquisition of historical CSLI pursuant to § 2703(d) did not violate or implicate the Fourth Amendment. Our holding in this regard is in accord with every federal circuit court to have considered the Fourth Amendment question before us.[40] Because we conclude the acquisition of historical CSLI is not a search under either the U.S. or Nebraska Constitution, we find no error in the district court's denial of Jenkins' motion to suppress. Given our resolution of this assignment or error, it is not necessary to address the other Fourth Amendment arguments raised by the parties.

---

[37] See *State v. Henderson*, 289 Neb. 271, 854 N.W.2d 616 (2014).

[38] *Smith v. Maryland, supra* note 15, 442 U.S. at 741.

[39] *Id.*, 442 U.S. at 744.

[40] *U.S. v. Graham, supra* note 30; *U.S. v. Davis, supra* note 4; *In re U.S. for Historical Cell Site Data, supra* note 30; *U.S. v. Skinner*, 690 F.3d 772 (6th Cir. 2012); *In re Electronic Communication Service to Disclose, supra* note 30.

## 2. Photographic Evidence

### (a) Background

Over Jenkins' objections, the trial court admitted three photographs of the crime scene into evidence. Each photograph depicts a pickup truck with the front and back doors open. The legs and feet of one victim are visible in the back seat. Another victim is seen slumped over in the front passenger seat; a single exit wound on his head is discernible. All three photographs were taken from a vantage point some distance back from the truck and generally depict, from different angles, the location and position of the pickup on the street and the position of the victims' bodies inside the pickup.

Jenkins objected to the three photographs on rule 403[41] grounds, arguing the probative value of the photographs was substantially outweighed by the danger of unfair prejudice. The record indicates the State offered the photographs to corroborate Bordeaux's testimony regarding the crime scene. After confirming the State did not intend to offer additional photographs of the victims' bodies, the district court overruled the rule 403 objection and admitted the photographs into evidence. Jenkins assigns this as error.

### (b) Standard of Review

[10,11] The admission of photographs of a gruesome nature rests largely with the discretion of the trial court, which must determine their relevancy and weigh their probative value against their prejudicial effect.[42] We review the court's admission of photographs of the victims' bodies for abuse of discretion.[43]

---

[41] See Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2008).

[42] *State v. Dubray*, 289 Neb. 208, 854 N.W.2d 584 (2014). See, also, *State v. Robinson*, 185 Neb. 64, 173 N.W.2d 443 (1970).

[43] *Id.*

#### (c) Analysis

On appeal, Jenkins argues the photographs were gruesome and therefore more prejudicial than probative. And she argues that even if the photographs were otherwise admissible, the use of three photographs was more than was "'absolutely necessary.'"[44]

[12-14] Under rule 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice or if it is needlessly cumulative.[45] We have often observed that gruesome crimes produce gruesome photographs.[46] And we have held that if the State lays proper foundation, photographs that illustrate or make clear a controverted issue in a homicide case are admissible, even if gruesome.[47] In a homicide prosecution, a court may admit into evidence photographs of a victim for identification, to show the condition of the body or the nature and extent of wounds and injuries to it, and to establish an element of the crime.[48]

Jenkins was charged with robbery rather than with homicide, but the photographs were relevant to show the location and position of the robbery victims after the crimes and to corroborate the testimony of the State's key witness, Bordeaux. The photographs also provided evidence that the victims' property was taken from them "forcibly and by violence"[49] and, as such, tended to establish one of the elements of the charged crimes. The photographs of the pickup were all taken

---

[44] Brief for appellant at 56.

[45] *State v. Grant*, 293 Neb. 163, 876 N.W.2d 639 (2016); *State v. Dubray, supra* note 42.

[46] *State v. Dubray, supra* note 42, citing *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000), *abrogated on other grounds, State v. Mata*, 275 Neb. 1, 745 N.W.2d 229 (2008).

[47] *State v. Dubray, supra* note 42.

[48] *Id.*

[49] See Neb. Rev. Stat. § 28-324(1) (Reissue 2008).

from a considerable distance; there were no closeup photographs of the victims or their injuries.

[15,16] Regarding Jenkins' argument that the three photographs were unnecessarily cumulative, we note that rule 403 does not require the State to have a separate purpose for every photograph.[50] Generally, when a court admits photographs for a proper purpose, additional photographs of the same type are not unfairly prejudicial.[51] Here, the photographs were not needlessly cumulative, because they each depicted the pickup and the nearby roads from a slightly different angle and distance, putting the scene into context.[52]

On this record, the prejudicial effect of the crime scene photographs did not substantially outweigh their probative value and the number of photographs was not needlessly cumulative. We find no abuse of discretion in admitting the photographs into evidence.

### 3. Insufficient Evidence

#### (a) Background

Jenkins claims the evidence at trial was insufficient to support her robbery convictions. She argues that for a variety of reasons, the testimony of Bordeaux and Ramirez-Martinez was not credible and should not have been believed by the jury. She also argues there was a lack of physical evidence linking her to the crime because none of the fingerprints found at the scene matched hers, none of the DNA obtained in the investigation matched her profile, and police did not test any of her clothing for gunshot residue.

#### (b) Standard of Review

[17] In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination

---

[50] *State v. Oliveira-Coutinho, supra* note 8; *State v. Dubray, supra* note 42.

[51] See *id.*

[52] See *State v. Grant, supra* note 45.

thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or reweigh the evidence; such matters are for the finder of fact.[53] The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[54]

### (c) Analysis

To the extent Jenkins' arguments on appeal ask us to reweigh the evidence or pass on the credibility of the witnesses, we decline to do so, because those were matters for the jury.[55] Viewing the evidence in the light most favorable to the prosecution, the evidence was sufficient to support the jury's verdict.

[18] A person commits robbery if, with the intent to steal, he or she forcibly and by violence, or by putting in fear, takes from the person of another any money or personal property of any value whatever.[56] In this case, an aiding and abetting instruction was given to the jury that provided:

> [Jenkins] can be guilty of robbery even though she personally did not commit any act involved in the crime so long as she aided someone else to commit it. [Jenkins] aided someone else if:
>
> 1. [Jenkins] intentionally encouraged or intentionally helped another person to commit the robbery; and
>
> 2. [Jenkins] intended that the robbery be committed; or [Jenkins] expected the other person to commit the robbery; and

---

[53] *State v. Weideman, supra* note 22. See, *State v. Erpelding*, 292 Neb. 351, 874 N.W.2d 265 (2015); *Clark v. State*, 151 Neb. 348, 37 N.W.2d 601 (1949).

[54] *State v. Weideman, supra* note 22. See *State v. Erpelding, supra* note 53.

[55] See *id*.

[56] § 28-324.

3. The robbery in fact was committed by that other person.

Bordeaux testified that she and Jenkins agreed to lure men to a place where Nikko could rob them, and she testified that Nikko robbed, and then murdered, Uribe-Pena and Cajiga-Ruiz.

The CSLI evidence generally followed the timeline of events as testified to by Bordeaux, Ramirez-Martinez, and a Council Bluffs police officer. Bordeaux testified that Jenkins called Nikko from the victims' apartment once the plan was underway, and the evidence showed that calls involving Jenkins' cell phone were routed through a cell tower one block from Uribe-Pena's apartment between about 1:30 and 2:09 a.m. Shortly thereafter, at 2:17 a.m., a call from Jenkins' cell phone was routed through a cell tower near the location where Uribe-Pena and Cajiga-Ruiz were robbed and murdered. Bordeaux testified that after the robbery, she, Jenkins, and Nikko drove to a motel in Council Bluffs. A Council Bluffs police officer testified he was patrolling the motel parking lot at approximately 3:40 a.m. and contacted a black female in a vehicle registered to Jenkins. Several calls from Jenkins' cell phone between about 3:45 and 3:50 a.m. were routed through a cell tower located in Council Bluffs.

This evidence, if believed by the finder of fact, was more than sufficient to convict Jenkins of robbery. Her assignment to the contrary is without merit.

### 4. Motion for New Trial

#### (a) Background

Jenkins filed a motion for new trial based on an alleged violation of *Brady v. Maryland*,[57] claiming the State had an undisclosed tacit agreement with Lori Sayles for her testimony. Sayles was the only witness called by the defense at

---

[57] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

trial. The State had endorsed Sayles as a witness, but did not call her.

Sayles is the sister of Jenkins and Nikko and a cousin of Bordeaux. Sayles testified that on August 10, 2013, she was staying with her mother and other family members in a motel room in Council Bluffs. Sayles testified that when she fell asleep around 11 p.m., Jenkins, Nikko, and Bordeaux were all in the motel room. When Sayles awakened at 4 a.m., she saw Jenkins asleep in the motel room but did not see Nikko or Bordeaux. Sayles was asked, "Do you have any information that . . . Jenkins left at all that evening?" and she responded, "No."

On cross-examination, Sayles admitted that a couple of days after the double murder, she talked with Jenkins about it and that Jenkins compared it to a horror movie entitled "The Hills Have Eyes." She testified that Jenkins "never verbally said [she] was there, but what she was saying will make her probably present." Sayles also recalled Jenkins saying "she heard gunshots and ran away."

On redirect, Sayles admitted she was being held in jail pending trial on felony charges in a separate criminal matter. She was asked whether, by testifying as she did on cross-examination, she was hoping for dismissal of the charges in her own case or favorable consideration at sentencing. She denied that was her motivation.

Approximately 1 week after Sayles testified in Jenkins' trial, Sayles' attorney filed a motion for bond review asking that Sayles be released on a recognizance bond. The State did not object to the request, and the district court granted the bond reduction.

Jenkins then moved for a new trial, claiming the State failed to disclose a tacit agreement with Sayles "to release . . . Sayles from custody as a result of her anticipated trial testimony" and that doing so violated *Brady*. At the hearing on the motion for new trial, Sayles' defense attorney testified he

had been representing Sayles since the inception of her felony charges and that there had never been a plea agreement or an agreement "of any kind" with the State that if Sayles testified a certain way, she would receive any benefit.

The district court overruled Jenkins' motion for new trial. Regarding its earlier decision to release Sayles on a recognizance bond, the court explained:

> At the bond review, this Court was advised that the minimum sentence for each of the charges against Ms. Sayles was one year and that Ms. Sayles had been in jail [for] over a year at the time of the . . . bond review. The Court was further advised of her truthfulness at the trial, that she had never actively participated in any crime, that she had no criminal record, she was 18 years old at the time of these crimes, and [her defense attorney] requested that Ms. Sayles should be released on her own recognizance. There was no objection by the Stat[e] of Nebraska, and this Court released Ms. Sayles on her own recognizance.

The district court acknowledged that the State's decision not to object at Sayles' bond review hearing was circumstantial evidence of a possible agreement, but found it was insufficient to prove an agreement, particularly when both Sayles and her counsel testified that Sayles had no agreement with the State. Finding that no agreement had been proved to support a *Brady* violation, the district court denied the motion for new trial. Jenkins assigns this as error.

### (b) Standard of Review

[19] In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed.[58]

---

[58] *State v. Ballew*, 291 Neb. 577, 867 N.W.2d 571 (2015).

### (c) Analysis

[20] In *Brady*, the U.S. Supreme Court held that the prosecution has a duty to disclose all favorable evidence to a criminal defendant prior to trial.[59] In *United States v. Bagley*,[60] the Court clarified that impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule.[61] Here, Jenkins claims the State failed to disclose a tacit agreement with Sayles which Jenkins could have used to impeach Sayles' credibility.

In *State v. Rice*,[62] a prosecution witness charged with the same murder as the defendant explained that he chose to testify because he felt things would go easier for him if he did, but he repeatedly denied there was any agreement with the prosecution for his testimony. We held that while the evidence established the witness had an expectation of leniency in exchange for his testimony, it fell short of establishing an express or implied promise by the State. We reach the same conclusion here.

[21] Both Sayles and her defense attorney testified there was no agreement with the State for Sayles' testimony, and Sayles denied she was hoping for leniency at sentencing or dismissal of the charges in exchange for her testimony. A trial judge is accorded significant discretion in granting or denying a motion for new trial, because the trial judge sees the witnesses, hears the testimony, and has a special perspective on the relationship between the evidence and the verdict.[63] On this record, we find no abuse of discretion in the district court's denial of the motion for new trial.

---

[59] See *State v. Patton*, 287 Neb. 899, 845 N.W.2d 572 (2014).

[60] *United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).

[61] *State v. Patton, supra* note 59.

[62] *State v. Rice*, 214 Neb. 518, 335 N.W.2d 269 (1983).

[63] *State v. Archie*, 273 Neb. 612, 733 N.W.2d 513 (2007).

### 5. Habitual Criminal Enhancement

#### (a) Background

Prior to sentencing, the court held a hearing on the habitual criminal enhancement. The State offered, and the court received, certified copies of two prior felony convictions: a 2006 conviction for attempted robbery for which Jenkins received a prison sentence of 4 to 8 years and a 2009 conviction for unlawful possession with intent to deliver a controlled substance for which she received a consecutive prison sentence of 1 year. The district court found Jenkins was a habitual criminal. She assigns this as error.

#### (b) Standard of Review

[22,23] An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.[64] Statutory interpretation presents a question of law, for which an appellate court has an obligation to reach an independent conclusion irrespective of the determination made by the court below.[65]

#### (c) Analysis

Subject to exceptions not applicable to this case, Nebraska's habitual criminal statute, Neb. Rev. Stat. § 29-2221 (Reissue 2008), provides in relevant part:

> (1) Whoever has been twice convicted of a crime, sentenced, and committed to prison . . . for terms of not less than one year each shall, upon conviction of a felony committed in this state, be deemed to be a habitual criminal and shall be punished by imprisonment . . . for a mandatory minimum term of ten years and a maximum term of not more than sixty years . . . .

[24] In a habitual criminal proceeding, the State's evidence must establish with requisite trustworthiness, based

---

[64] *State v. Custer*, 292 Neb. 88, 871 N.W.2d 243 (2015).

[65] *State v. Wang*, 291 Neb. 632, 867 N.W.2d 564 (2015).

upon a preponderance of the evidence, that (1) the defendant has been twice convicted of a crime, for which he or she was sentenced and committed to prison for not less than 1 year; (2) the trial court rendered a judgment of conviction for each crime; and (3) at the time of the prior conviction and sentencing, the defendant was represented by counsel or had knowingly and voluntarily waived representation for those proceedings.[66]

Here, the district court found the State had proved Jenkins had two valid prior convictions for purposes of habitual criminal enhancement. On appeal, Jenkins does not suggest the evidence regarding either prior conviction was lacking. Instead, she argues that because she committed the 2009 felony while still on parole for the 2006 felony, her second conviction should not be considered valid for purposes of habitual criminal enhancement. In other words, she suggests that because she had not finished serving the sentence imposed for her 2006 conviction when she committed the crime resulting in her 2009 conviction, she cannot be found to be a habitual criminal. She relies on language in *State v. Ellis*[67] to support her novel argument.

[25] In *Ellis*, we held that in order to warrant enhancement under the habitual criminal statute, "the prior convictions, except the first conviction, must be for offenses committed after each preceding conviction, and all such prior convictions must precede the commission of the principal offense."[68] Because both of Ellis' prior convictions had been imposed at the same time, we reversed the finding that he was a habitual criminal and we remanded the cause for resentencing. In discussing the purpose of Nebraska's habitual criminal statutes, we observed:

---

[66] *State v. Kinser*, 283 Neb. 560, 811 N.W.2d 227 (2012); *State v. Epp*, 278 Neb. 683, 773 N.W.2d 356 (2009).

[67] *State v. Ellis*, 214 Neb. 172, 333 N.W.2d 391 (1983).

[68] *Id.* at 176, 333 N.W.2d at 394.

We believe that the purpose of enacting the habitual criminal statute is to serve as a warning to previous offenders that if they do not reform their ways they may be imprisoned for a considerable period of time, regardless of the penalty for the specific crime charged. . . . "'Recidivist statutes are enacted in an effort to deter and punish incorrigible offenders. . . . They are intended to apply to persistent violators who have not responded to the restraining influence of conviction and punishment.' . . . 'It is the *commission* of the second felony *after conviction* for the first, and the *commission* of the *third* felony *after conviction* of the second that is deemed to make the defendant incorrigible.' . . ."[69]

Jenkins focuses on this language to argue that, before a third felony conviction can be considered valid under the habitual criminal statute, a defendant must have "committed the first offense, received the full social benefit or effect of that punishment, then committed a second offense, and received the full social benefit or effect of that second punishment prior to the commission of the third offense."[70]

We reject this argument in its entirety. It misapplies our comment in *Ellis* and is fundamentally inconsistent with the language and the purpose of the habitual criminal statute. The habitual criminal statute is designed to deter and punish recidivism,[71] but Jenkins' interpretation would actually incentivize recidivism by encouraging offenders to commit subsequent crimes while still on probation or parole, in order to immunize the subsequent crime from the possibility of habitual criminal enhancement.

---

[69] *Id*. at 175-76, 333 N.W.2d at 394 (emphasis in original), quoting *State v. Pierce*, 204 Neb. 433, 283 N.W.2d 6 (1979) (Hastings, J., dissenting; Krivosha, C.J., and McCown, J., join), and *Coleman v. Commonwealth*, 276 Ky. 802, 125 S.W.2d 728 (1939).

[70] Brief for appellant at 58.

[71] *State v. Ellis, supra* note 67.

[26,27] As we stated in *Ellis*: "'"[W]here the sequence of prior convictions is in issue, the rule . . . is that each successive felony must be committed after the previous felony conviction in order to count towards habitual criminal status."'' . . ."[72] So long as each successive felony is committed after the previous felony conviction, it is immaterial to the habitual criminal analysis that an offender has not yet finished serving his or her sentence on the previous felony. Jenkins' argument is meritless, and the district court did not abuse its discretion in finding she was a habitual criminal.

## V. CONCLUSION

For the foregoing reasons, we affirm the convictions and sentences in all respects.

AFFIRMED.

---

[72] *Id.* at 176, 333 N.W.2d at 394.