Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/07/2020 08:08 AM CDT

State of Nebraska, appellee, v.
Leandre R. Jennings III, appellant.
___ N.W.2d ___

Filed May 15, 2020.    No. S-18-1186.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Motions to Suppress: Pretrial Procedure: Trial: Appeal and Error.** When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from trial and from the hearings on the motion to suppress.

3. **Evidence: Appeal and Error.** A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion.

4. **Search Warrants: Affidavits: Probable Cause: Appeal and Error.** In reviewing the strength of an affidavit submitted as a basis for finding probable cause to issue a search warrant, an appellate court applies a totality of the circumstances test.

5. **____: ____: ____: ____.** In reviewing the strength of an affidavit submitted as a basis for finding probable cause to issue a search warrant, the question is whether, under the totality of the circumstances illustrated by the affidavit, the issuing magistrate had a substantial basis for finding that the affidavit established probable cause.

6. **Search Warrants: Probable Cause: Words and Phrases.** Probable cause sufficient to justify issuance of a search warrant means a fair probability that contraband or evidence of a crime will be found.

7. **Verdicts: Juries: Appeal and Error.** Harmless error review looks to the basis on which the jury actually rested its verdict. The inquiry is not whether in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the actual guilty verdict rendered was surely unattributable to the error.

8. **Judgments: Appeal and Error.** A proper result will not be reversed merely because it was reached for the wrong reason.

9. **Search Warrants: Affidavits: Evidence: Appeal and Error.** In evaluating the sufficiency of an affidavit used to obtain a search warrant, an appellate court is restricted to consideration of the information and circumstances contained within the four corners of the affidavit, and evidence which emerges after the warrant is issued has no bearing on whether the warrant was validly issued.

10. **Constitutional Law: Search and Seizure: Search Warrants: Probable Cause.** The particularity requirement of the Fourth Amendment protects against open-ended warrants that leave the scope of the search to the discretion of the officer executing the warrant, or permit seizure of items other than what is described.

11. **Search Warrants: Search and Seizure.** A warrant whose authorization is particular has the salutary effect of preventing overseizure and oversearching.

12. **Search Warrants: Police Officers and Sheriffs.** A search warrant must be sufficiently particular to prevent an officer from having unlimited or unreasonably broad discretion in determining what items to seize.

13. **Search Warrants: Evidence: Police Officers and Sheriffs.** Absent a showing of pretext or bad faith on the part of the police or the prosecution, valid portions of a warrant are severable from portions failing to meet the particularity requirements.

14. **Criminal Law: Appeal and Error.** Harmless error jurisprudence recognizes that not all trial errors, even those of constitutional magnitude, entitle a criminal defendant to the reversal of an adverse trial result.

15. **Convictions: Appeal and Error.** It is only prejudicial error, that is, error which cannot be said to be harmless beyond a reasonable doubt, which requires that a conviction be set aside.

16. **Appeal and Error.** When determining whether an alleged error is so prejudicial as to justify reversal, courts generally consider whether the error, in light of the totality of the record, influenced the outcome of the case.

17. **Verdicts: Evidence: Appeal and Error.** Overwhelming evidence of guilt can be considered in determining whether the verdict rendered was surely unattributable to the error, but overwhelming evidence of guilt is not alone sufficient to find the erroneous admission of evidence harmless.

Appeal from the District Court for Douglas County: Kimberly Miller Pankonin, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Freudenberg, J.

## I. NATURE OF CASE

Leandre R. Jennings III was convicted of first degree murder, use of a deadly weapon to commit a felony, and possession of a deadly weapon by a prohibited person. The district court sentenced Jennings to consecutive terms of imprisonment for life, 30 to 40 years, and 40 to 45 years, respectively. Before trial, Jennings made two motions to suppress evidence obtained from searches of cell phone records and his residence. The first motion to suppress was based on cell phone records obtained pursuant to a provision within the federal Stored Communications Act, which has since been ruled unconstitutional. In the second motion to suppress, Jennings challenges the language of several paragraphs in the warrant as violating the particularity requirements of the Fourth Amendment. The district court denied these motions, and Jennings renewed the objections at trial. He now appeals.

## II. BACKGROUND

Michael Brinkman was fatally shot during a home invasion in Omaha, Nebraska. Michael's wife, Kimberly Milius (Kimberly), and their son, Seth Brinkman, were home during the invasion. After the investigation led law enforcement to suspect Jennings, he was arrested. The State charged Jennings with first degree murder under Neb. Rev. Stat. § 28-303 (Reissue 2016), a Class IA felony; use of a deadly weapon

(firearm) to commit a felony under Neb. Rev. Stat. § 28-1205 (Reissue 2016), a Class IC felony; and possession of a deadly weapon (firearm) by a prohibited person under Neb. Rev. Stat. § 28-1206 (Reissue 2016), a Class ID felony. Jennings was found guilty in a trial by jury.

At trial, Kimberly and Seth testified to what they witnessed during the home invasion that lead to Michael's death. Kimberly testified that during the early evening of December 23, 2016, Michael, Kimberly, and Seth were at home getting ready to go out to dinner. Both Michael and Seth were showering in their respective bathrooms. As Michael was getting out of the shower, he asked Kimberly to answer the front door. Kimberly looked out a window and did not see anyone, though she did see a white sport utility vehicle parked in their driveway.

Kimberly opened the front door, and two men with guns, wearing masks and what appeared to be surgical gloves, forced their way into the home at gunpoint. One of the men was wearing a "[S]anta" hat. Kimberly asked the men what they wanted, and they answered, "Money." Kimberly offered to get her purse, but one of the men put a gun to her head and backed her into a corner of the living room. The other man, who was wearing the Santa hat, went down the hallway toward Michael's room. Kimberly heard a gunshot, then scuffling sounds and another gunshot. After the gunshots, the first assailant ordered Kimberly into the master bedroom. As she entered the room, she saw Seth strike the second assailant with a shower rod. Kimberly testified that the second assailant was the same size as Jennings.

Seth's testimony described the intruders in a similar fashion. He testified that he was in the shower when he heard his mother scream. He turned off the shower after he heard "rustling" sounds in the hallway. Seth peeked out of the shower and then heard a gunshot from the master bedroom. At that point, Seth grabbed the shower rod off the wall and went into the master bedroom, where he encountered and attacked the

second assailant. During the scuffle, the Santa hat fell off the second assailant's head. When the first assailant subsequently entered the room with Kimberly, he punched Seth and wrestled the shower rod away from him. The first assailant ordered Kimberly and Seth "to get down and to shut up." The second assailant left the room and returned a short time later with what appeared to be a white "money bag." Seth testified that the second assailant said something to the first and that they then left, taking Kimberly's cell phone with them.

After they left, Kimberly ran to lock the front door and Seth went to look for Michael. Seth first went to the bathroom where he had showered, in order to put on his clothes. When doing so, he noticed that his shorts had some sort of sauce on them and that there were fast food items on the floor. The items included a partially eaten piece of "Texas toast," some "fries," and a container of sauce from a Raising Cane's restaurant. Seth testified that none of those items were present before the intruders arrived.

Seth then went to an upstairs bedroom and found the door was difficult to open. Seth forced the door open and discovered the door had been blocked by Michael, who was lying on the floor. Seth called for Kimberly, and she used Seth's cell phone to call the 911 emergency dispatch service while Seth tried to aid Michael.

The first officer on the scene entered the home and found Michael with Seth, and the officer then requested medical assistance. An ambulance rushed Michael to the hospital, but he did not survive. Michael's autopsy established that the cause of death was a gunshot wound to the chest.

Kimberly and Seth provided descriptions of the intruders to law enforcement. During a canvassing of the neighborhood, law enforcement obtained surveillance video from a neighbor which showed a white sport utility vehicle driving by the Brinkman residence several times around the time of the attack. The lead detective viewed the videos and recognized the vehicle as a Dodge Durango. Police also released a

photograph and description of the vehicle to the media seeking the public's help in locating the vehicle or suspects.

Members of the forensics team came and collected evidence, including DNA swabs from the Texas toast, the Raising Cane's sauce container, the shower rod, and the Santa hat. Police also collected three spent shell casings from the residence, later determined to be .380 caliber.

On January 2, 2017, law enforcement received an anonymous telephone call indicating the caller had seen the Durango in the lot of an apartment complex several days before the murder. The caller claimed to have observed two black males exit the vehicle and go to an apartment on the third floor of an adjoining building. The caller provided the license plate number on the vehicle.

Police determined that the vehicle belonged to a car rental company. The records provided by the rental company showed that from December 13 through 27, 2016, the vehicle was rented to Carnell Watt. The owner of the rental company office told police that Watt regularly rents vehicles from that location and that she frequently came in with Jennings, whom she would introduce as her husband.

Police recovered the vehicle from a car rental office in Detroit, Michigan, and conducted a digital forensics examination. The Durango was equipped to keep a time-stamped list of all cell phones which have previously had a Bluetooth connection to the vehicle. Cell phones associated with Watt, her sister, and Jennings were connected to the Durango during the dates Watt rented the vehicle. During an interview with Omaha police, Watt indicated that she lent the Durango to Jennings during the rental period.

On February 13, 2017, law enforcement personnel received a response from the Federal Bureau of Investigation's national DNA database commonly referred to as "CODIS" informing them that the DNA swab of the Texas toast included Jennings as a probable match. Law enforcement then sought permission from the court to obtain Jennings' cell site

location information (CSLI) pursuant to a provision within the Stored Communications Act. Law enforcement sought records from cell service companies for Jennings. Only the records obtained from one such company are challenged on appeal. That company provided Jennings' cell phone records and CSLI in response to a court order which showed that Jennings' cell phone was in the area of the crime around the relevant times.

Police also obtained Watt's cell phone records, which showed that on the day of the homicide, her cell phone was located in the area of her place of employment, which is not close to the location of the homicide. However, the records also showed that at around 3 p.m. on December 23, 2016, Watt's cell phone was briefly in the area of a Raising Cane's restaurant located in Council Bluffs, Iowa.

On February 16, 2017, law enforcement viewed the surveillance video for December 23, 2016, from the Council Bluffs Raising Cane's restaurant in question and observed a white sport utility vehicle in the drive-through lane of the restaurant between 3:17 and 3:23 p.m. The video displayed two unidentifiable occupants and a particular item of clothing worn by the driver. The item worn by the driver was described as a dark shirt with light stripes.

Using all of the aforementioned information, a detective applied for a search warrant for a specific address on North 60th Street. The affidavit detailed the description of the intruders as wearing gloves and masks, noted the various clothing items described during the intrusion and seen on the Raising Cane's surveillance video, indicated that the CSLI data placed Jennings' phone near the Brinkman residence before and after the time of the murder, and specified that the Nebraska State Patrol had notified Omaha police of a possible CODIS match to Jennings from one of the items recovered at the scene. The affidavit also noted that the address Jennings had provided to his probation officer was on Sprague Street, but that Jennings also had a vehicle registered in Nebraska

with a North 60th Street address and that a utilities district's records showed Watt and Jennings listed as residents there. The court reviewed all of the information provided by the detective and issued a search warrant for the North 60th Street address.

The detective testified to how the search warrant was executed at the North 60th Street residence. The Omaha "crime lab" accompanied him and several officers to the address. After entry was made, the crime lab took pictures of everything in the residence before anything was disturbed.

The search warrant contained numbered paragraphs specifying the parameters of the search. The warrant read as follows:

> 1) Venue Items identifying those parties who either own or who are in control of the residence [on] **North 60th Street,** Omaha, Douglas County, Nebraska;
>
> 2) The ability to seize and process item(s) of evidentiary value, to include: cellular phone(s), computer(s) recording device(s) including audio and video, companion equipment, records, whether stored on paper, magnetic media such as tape, cassette, disk, diskettes, or on memory storage devices such as optical disks, programmable instruments such as telephones, "electronic address books", or any other storage media, together with indicia of use, ownership, possession or control of the aforementioned residence;
>
> 3) Any make and model firearm(s) which fires a 380 caliber cartridge . . . ;
>
> 4) Unknown brand/size/construction mask which could be used to conceal the wearers face;
>
> 5) Clothing items to include but not limited to grey hooded sweatshirt, navy blue hooded sweatshirt, blue athletic style warm-up pants with white stripes;
>
> 6) Blue or Black in color latex or similar construction gloves[.]

The evidence recovered from the search of the North 60th Street residence included photographs of the condition of the

residence before it was searched; various documents establishing residency for Watt and Jennings; photographs of clothing items, some of which items were seized; and photographs of cell phones along with their retail boxes.

After he was arrested, a buccal swab was taken from Jennings and compared to the DNA evidence recovered at the scene. Comparison of the swab taken from the Texas toast to a buccal swab taken from Jennings after he was arrested found that Jennings was the probable major contributor to the DNA detected. A forensic DNA analyst from the University of Nebraska Medical Center testified that the probability of a random individual's matching a DNA profile found within the major component of the mixture given that Jennings expresses such a profile is approximately 1 in 123 octillion.

Before trial, Jennings moved to suppress (1) his cell phone records and (2) evidence obtained from the search of his residence. Jennings argued that his cell phone records, which included CSLI, should be suppressed because they were obtained through a court order under a provision within the Stored Communications Act, instead of through search warrants, and because there was insufficient probable cause to support a warrant.

Jennings argued that the evidence obtained from the search of his residence should be suppressed because the search warrant was not sufficiently particular and because there was not probable cause to support it. Specifically, Jennings argued that the CSLI information and the DNA information provided in the affidavit should be excluded from the probable cause analysis. The affidavit in support of the warrant contained information summarizing the investigation details recounted above and also reported the call record and CSLI obtained from Jennings' cell phone. The affidavit explained that the University of Nerbaska Medical Center's human DNA laboratory built a "mainly single source male" DNA profile from the piece of Texas toast and that profile was a probable match in the CODIS system for Jennings.

At the request of the parties, the district court postponed ruling on Jennings' motions to suppress until after the U.S. Supreme Court issued its ruling in *Carpenter v. U.S.*,[1] which involved whether a search warrant was required to obtain CSLI. While *Carpenter* was pending, law enforcement obtained search warrants for Jennings' cell phone records.

On June 22, 2018, the U.S. Supreme Court issued its opinion in *Carpenter* and held therein that a search warrant was required to obtain a person's CSLI. Thereafter, the district court held additional hearings on Jennings' motions to suppress. In a subsequent written order, the district court denied Jennings' motions to suppress. The district court denied Jennings' motion to suppress his cell phone records because although law enforcement's initial orders were insufficient under *Carpenter*, the later search warrants cured that defect. The district court denied Jennings' motion to suppress the evidence obtained from the search of his residence because the search warrant was sufficiently particular and supported by probable cause. Jennings renewed his objections at trial, and they were overruled. Several items and photographs obtained during the search were admitted into evidence over a continuing objection from Jennings.

## III. ASSIGNMENTS OF ERROR

Jennings assigns that the district court erred in denying his two motions to suppress, in violation of his constitutional rights. First, Jennings assigns that obtaining the cell phone records and CSLI from the court order pursuant to a provision within the Stored Communications Act was held to be unconstitutional by *Carpenter* and that the district court erred by concluding that the subsequent warrant cured the constitutional violation. Second, Jennings assigns that the denial of the motion to suppress the evidence obtained from the search of his residence was error because the affidavit to support the

---

[1] *Carpenter v. U.S.*, ___ U.S. ___, 138 S. Ct. 2206, 201 L. Ed. 2d 507 (2018).

warrant was insufficient and the warrant itself lacked the particularity required by the U.S. Constitution.

## IV. STANDARD OF REVIEW

[1] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review.[2] Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.[3]

[2] When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from trial and from the hearings on the motion to suppress.[4]

[3] A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion.[5]

[4-6] In reviewing the strength of an affidavit submitted as a basis for finding probable cause to issue a search warrant, an appellate court applies a totality of the circumstances test.[6] The question is whether, under the totality of the circumstances illustrated by the affidavit, the issuing magistrate had a substantial basis for finding that the affidavit established probable cause.[7] Probable cause sufficient to justify issuance of a search warrant means a fair probability that contraband or evidence of a crime will be found.[8]

---

[2] *State v. Brye*, 304 Neb. 498, 935 N.W.2d 438 (2019).

[3] *Id.*

[4] *State v. Baker*, 298 Neb. 216, 903 N.W.2d 469 (2017).

[5] *Id.*

[6] *State v. Goynes*, 303 Neb. 129, 927 N.W.2d 346 (2019).

[7] *Id.*

[8] *Id.*

[7] Harmless error review looks to the basis on which the jury actually rested its verdict. The inquiry is not whether in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the actual guilty verdict rendered was surely unattributable to the error.[9]

## V. ANALYSIS

Jennings correctly asserts that seizure of his cell phone records and CSLI under a provision within the Stored Communications Act was a violation of his Fourth Amendment rights. However, the fact that the relevant provision of the Stored Communications Act was not determined to be unconstitutional until 18 months after the order in this case leads us to conclude that the exclusion of the evidence is subject to the good faith exception established in *Illinois v. Krull*.[10] Thus, the district court correctly denied Jennings' motion to suppress related to the cell phone records and CSLI. Jennings' assertion that the information obtained from the seizure of the cell phone records and CSLI should be excluded from a probable cause analysis concerning the residential search warrant fails for the same reasons. We find that the record supports the district court's determination that the warrant was supported by probable cause. We also find that a majority of the provisions in the residential search warrant met the particularity requirements of the Fourth Amendment and that the masks, gloves, cell phones, and documents showing Jennings' occupancy were seized in accordance with these requirements. Assuming without deciding that the photographs taken by law enforcement of the interior of the residence, including photographs of items not specified in the warrant, were seized pursuant to invalid portions of the warrant, their admission was harmless error.

---

[9] *State v. Thompson*, 301 Neb. 472, 919 N.W.2d 122 (2018).

[10] See *Illinois v. Krull*, 480 U.S. 340, 107 S. Ct. 1160, 94 L. Ed. 2d 364 (1987).

### 1. Motion to Suppress Cell
### Phone Records and CSLI

Under *Carpenter*, the State conducted a search in violation of the Fourth Amendment when it used a court order pursuant to a provision within the federal Stored Communications Act, rather than a warrant, to acquire Jennings' cell phone records and CSLI.[11] However, the fact that Jennings' Fourth Amendment rights were violated does not mean the district court erred in denying the motion to suppress.[12] In addressing a nearly identical scenario, we recently observed that "the exclusionary rule is to be a 'last resort' and not a 'first impulse.'"[13] We find that exclusion of the CSLI evidence is not the appropriate remedy for the violation of Jennings' Fourth Amendment rights.

The exclusion of evidence obtained in violation of the Fourth Amendment is not itself a constitutional right.[14] Rather, it is a remedy designed to deter constitutional violations by law enforcement.[15] Thus, in situations where the exclusion as a remedy would not deter law enforcement, several exceptions to the exclusionary rule have been recognized.[16] One of those exceptions to the exclusionary rule applies to evidence

---

[11] See *Carpenter v. U.S., supra* note 1.

[12] See, *Herring v. United States*, 555 U.S. 135, 141, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009) (explaining that application of exclusionary rule is not "a necessary consequence of a Fourth Amendment violation"); *State v. Brown*, 302 Neb. 53, 921 N.W.2d 804 (2019), *cert. denied* ___ U.S. ___, 139 S. Ct. 2680, 204 L. Ed. 2d 1080.

[13] *State v. Brown, supra* note 12, 302 Neb. at 60, 921 N.W.2d at 811 (citing *Hudson v. Michigan*, 547 U.S. 586, 126 S. Ct. 2159, 165 L. Ed. 2d 56 (2006)).

[14] *Davis v. United States*, 564 U.S. 229, 131 S. Ct. 2419, 180 L. Ed. 2d 285 (2011) (citing *Stone v. Powell*, 428 U.S. 465, 96 S. Ct. 3037, 49 L. Ed. 2d 1067 (1976)).

[15] See *State v. Hoerle*, 297 Neb. 840, 901 N.W.2d 327 (2017).

[16] See, *Davis v. United States, supra* note 14; *Illinois v. Krull, supra* note 10; *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984); *State v. Hoerle, supra* note 15.

obtained by police in objectively reasonable reliance on a statute later found to be unconstitutional.[17]

When the police applied for the court order on February 14, 2017, for Jennings' cell phone records and CSLI from the cell service companies, they were making a request pursuant to a federal statute that had not yet been ruled unconstitutional. Law enforcement obtained the CSLI without first securing a warrant supported by probable cause, but did so as authorized by 18 U.S.C. § 2703(d) (Supp. V 2017) of the Stored Communications Act. It cannot be said that by doing so, law enforcement relied on a statute that was clearly unconstitutional. As we noted recently in *State v. Brown*,[18] many courts have held, as we did in *State v. Jenkins*,[19] that the Stored Communications Act did not violate the Fourth Amendment. *Carpenter* was decided nearly 18 months after the application for the records in this case.[20]

[8] We find that law enforcement made the request in objectively reasonable reliance on the Stored Communications Act and did not have reason to believe that the relevant provision of the act was unconstitutional. On these facts, exclusion of the cell phone records and the CSLI obtained under the court order would not serve as a deterrent to future Fourth Amendment violations by law enforcement, and its application is unwarranted. Thus, we conclude, albeit for reasons different from those articulated by the district court, that it did not err by denying Jennings' motion to suppress the cell phone records and CSLI. A proper result will not be reversed merely because it was reached for the wrong reason.[21] We need not address the validity of the subsequent warrants that Jennings asserts failed to cure the Fourth Amendment violation.

---

[17] *State v. Brown, supra* note 12.

[18] *Id.*

[19] *State v. Jenkins*, 294 Neb. 684, 884 N.W.2d 429 (2016).

[20] *Carpenter v. U.S., supra* note 1.

[21] *In re Estate of Odenreider*, 286 Neb. 480, 837 N.W.2d 756 (2013).

## 2. Motion to Suppress Evidence Recovered From Search of Residence

Jennings argues that the evidence recovered from the search of the North 60th Street residence should have been suppressed because the warrant lacked probable cause and, in the alternative, the warrant violated the particularity requirements of the Nebraska and U.S. Constitutions. The Fourth Amendment provides that warrants may not be granted "but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The Nebraska Constitution, under article I, § 7, similarly provides that "no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

### (a) Probable Cause

In reviewing the strength of an affidavit submitted as a basis for finding probable cause to issue a search warrant, an appellate court applies a totality of the circumstances test.[22] The question is whether, under the totality of the circumstances illustrated by the affidavit, the issuing magistrate had a substantial basis for finding that the affidavit established probable cause.[23] Probable cause sufficient to justify issuance of a search warrant means a fair probability that contraband or evidence of a crime will be found.[24]

[9] In evaluating the sufficiency of an affidavit used to obtain a search warrant, an appellate court is restricted to consideration of the information and circumstances contained within the four corners of the affidavit, and evidence which emerges after the warrant is issued has no bearing on whether the warrant was validly issued.[25]

---

[22] *State v. Goynes, supra* note 6.

[23] *Id.*

[24] *Id.*

[25] *Id.*

Because Jennings' CSLI had been obtained pursuant to a federal statute that a reasonable law enforcement officer would believe to be constitutional, we disagree with Jennings' argument that the statements in the affidavit supporting the residential search warrant, which referred to the cell phone records and CSLI obtained from the cell service company, should not be considered in a probable cause determination because they were fruit of the poisonous tree. Law enforcement officers were including in the affidavit in support of the residential search warrant all the information available to them and had no reason to believe that any of the information had been obtained in violation of Jennings' Fourth Amendment rights. Moreover, it was objectively reasonable for a law enforcement officer to believe that the cell phone information obtained from the court order was relevant and usable in future affidavits pertaining to the same investigation. Because a good faith exception applies to the initial court order, the same exception applies to the use of the cell phone records and the CSLI in the subsequent affidavit.[26]

We also disagree with Jennings' contention that the statement in the supporting affidavit about the possible DNA match to Jennings in the CODIS system was too vague to be properly relied upon to support a finding of probable cause. The portion of the affidavit concerning the DNA match reads as follows:

On January 23rd 2017 Investigators were notified of a mainly single source male DNA profile [which] was located from testing of EV#20.

On January 27th 2017 the UNMC Human DNA Laboratory submitted their findings to the Nebraska State Patrol for CODIS entry and search.

On February 13, 2017 Investigators were notified of a possible CODIS identification to the submitted sample [which] was that belonging to [Jennings].

---

[26] See, *United States v. Leon, supra* note 16; *State v. Brown, supra* note 12.

Jennings asserts that in order to include these statements in the probable cause analysis, we must make the impermissible assumption that the magistrate was familiar with CODIS and its limitations. Moreover, Jennings points out that the language of "possible CODIS identification" does not give details of the probability supporting the match.

But this is not how appellate courts review findings of probable cause in a warrant. We have long applied the same standard set forth by the U.S. Supreme Court in *Illinois v. Gates*.[27] When the Court adopted the totality of the circumstances test, it also explained that "'courts should not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense, manner.'"[28] We examine the affidavit using a commonsense approach to determine whether the magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing; the Fourth Amendment requires no more.[29]

We will not assume that a magistrate judge is unaware of the meaning of acronyms and abbreviations. We decline to assume that the magistrate judge did not know what the CODIS system is and then relied on information that he or she did not understand. The statements in the affidavit did not have the scientific detail provided by an expert witness at trial, but the Fourth Amendment does not require such a technical level of detail. The statements provided a link between the Texas toast found at the crime scene and a DNA sample from Jennings on file in the CODIS database. Using a commonsense approach, we find that the statements about the DNA evidence were clear enough to be properly considered in the probable cause analysis.

---

[27] *Illinois v. Gates*, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). See, also, *State v. Detweiler*, 249 Neb. 485, 544 N.W.2d 83 (1996).

[28] *Illinois v. Gates, supra* note 27, 462 U.S. at 236 (quoting *United States v. Ventresca*, 380 U.S. 102, 85 S. Ct. 741, 13 L. Ed. 2d 684 (1965)).

[29] See *State v. Detweiler, supra* note 27.

Moreover, in addition to the CSLI and DNA information discussed above, the affidavit in support of the search warrant recounted several important details from the investigation. Law enforcement recounted the eyewitness statements about the clothing worn by the assailants, the presence of the food left at the scene, the description of the white sport utility vehicle in the driveway, the video obtained from the neighbor's house depicting a white Durango driving by multiple times, and the information obtained from the anonymous tip which led the authorities to question the car rental company and trace the vehicle to Watt. The affidavit further recounted that Watt had stated in an interview with the Omaha police that she allowed Jennings to use the Durango rented in her name. Police also described the surveillance video acquired from the Raising Cane's restaurant in Council Bluffs showing a white Durango go through the drive-through lane during the time that Watt's and Jennings' cell phones show them to be in the area. The CSLI recovered from the court order indicated that Jennings' cell phone was in an area near the Brinkman residence before and after the murder. We find, under the totality of the circumstances, that there was sufficient information contained within the affidavit to support the court's finding of probable cause to issue the warrant for the search of the North 60th Street residence.

### (b) Particularity Requirement

Jennings alternatively argues that all evidence from the residential search should have been suppressed because the language contained in paragraphs 1, 2, and 5 of the warrant violated the particularity requirement of the U.S. and Nebraska Constitutions. The evidence recovered from the search of the North 60th Street residence includes various documents establishing residency for Watt and Jennings, clothing items, various types of gloves, and two cell phones. Photographs of the two cell phones along with their retail boxes were also taken and admitted into evidence. Law enforcement also took photographs of the condition of the residence before it was searched, which were entered into evidence.

[10,11] In addition to the requirement of probable cause, the Fourth Amendment contains a particularity requirement.[30] The particularity requirement of the Fourth Amendment protects against open-ended warrants that leave the scope of the search to the discretion of the officer executing the warrant, or permit seizure of items other than what is described.[31] A warrant whose authorization is particular has the salutary effect of preventing overseizure and oversearching.[32]

[12] We have held that "a warrant must be sufficiently particular to prevent the officer from having unlimited or unreasonably broad discretion in determining what items to seize."[33] In determining whether a warrant is sufficiently particular, we find the factors listed by this court in *State v. Baker*[34] to be applicable. Those are (1) whether the warrant communicates objective standards for an officer to identify which items may be seized, (2) whether there is probable cause to support the seizure of the items listed, (3) whether the items in the warrant could be more particularly described based on the information available at the time the warrant was issued, and (4) the nature of the activity under investigation.[35] The majority of jurisdictions utilize the same or similar factors.[36]

---

[30] *State v. Henderson*, 289 Neb. 271, 854 N.W.2d 616 (2014); *State v. Sprunger*, 283 Neb. 531, 811 N.W.2d 235 (2012).

[31] *State v. Henderson, supra* note 30 (citing *U.S v. Clark*, 754 F.3d 401 (7th Cir. 2014)).

[32] *Id*.

[33] *State v. Baker, supra* note 4, 298 Neb. at 228-29, 903 N.W.2d at 478.

[34] *State v. Baker, supra* note 4.

[35] See, *id.*; *State v. Tyler*, 291 Neb. 920, 870 N.W.2d 119 (2015). See, also, *U.S. v. Sigillito*, 759 F.3d 913 (8th Cir. 2014); *United States v. Spilotro*, 800 F.2d 959 (9th Cir. 1986).

[36] See, *U.S. v. Sanjar*, 876 F.3d 725 (5th Cir. 2017); *U.S. v. Sigillito, supra* note 35; *U.S. v. Kuc*, 737 F.3d 129 (1st Cir. 2013); *U.S. v. Rosa*, 626 F.3d 56 (2d Cir. 2010); *U.S. v. Sells*, 463 F.3d 1148 (10th Cir. 2006); *U.S. v. Blakeney*, 942 F.2d 1001 (6th Cir. 1991); *United States v. Spilotro, supra* note 35. See, also, *State v. Hughes*, 433 So. 2d 88 (La. 1983); *State v. Jackson*, 150 Wash. 2d 251, 76 P.3d 217 (2003).

As these factors make apparent, the level of particularity that is required depends on the nature of the items under investigation. Further, whether a warrant violates the particularity clause must be determined in light of the language as a whole.[37]

In two cases, we found clauses under the circumstances that deemed authorizing the search of "any and all firearms" to be sufficiently particular. In *Baker*, we held that such a clause was sufficiently particular to enable the searching officers to identify the property authorized to be seized.[38] We upheld a similar challenge in *State v. Tyler*[39] to the seizure of a gunlock found during a residential search where the warrant read in part: "'1) Any and all firearms, and companion equipment to include but not limited to ammunition, holsters, spent projectiles, spent casings, cleaning kits/cases and boxes, paperwork, and the like.'" Prior to seeking the warrant, the police had determined that there were approximately 20 different firearms capable of using the type of cartridge recovered from the scene of a shooting.[40] We determined that this paragraph was sufficiently particular because the scope of the search was not left to the discretion of the officers. We also explained that the nature of the activity under investigation justifies its scope. When police are investigating a murder that occurred with a gun and there is a range of firearms fitting the known characteristics of the murder weapon, it is sufficient to describe the items to be searched for as "[a]ny and all firearms . . . ."[41]

In contrast, in *State v. Henderson*,[42] we found that the clause of a warrant authorizing the search for "'[a]ny and all information'" contained in a cell phone was unconstitutional

---

[37] See *Stanford v. Texas*, 379 U.S. 476, 85 S. Ct. 506, 13 L. Ed. 2d 431 (1965).

[38] *State v. Baker, supra* note 4.

[39] *State v. Tyler, supra* note 35, 291 Neb. at 934, 870 N.W.2d at 130.

[40] *State v. Tyler, supra* note 35.

[41] See *id.* at 934, 870 N.W.2d at 130.

[42] *State v. Henderson, supra* note 30, 289 Neb. at 276-77, 854 N.W.2d at 625.

because the warrant did not identify a particular crime or relevant evidence intended to be recovered from the cell phone. We held that a warrant for the search of the contents of a cell phone must be sufficiently limited in scope to allow a search of only that content that is related to the probable cause that justifies the search. We also held that the catchall provision of the warrant authorizing the search of "'any other information that can be gained from the internal components and/or memory Cards'" was insufficiently particular to satisfy the Fourth Amendment even when it was preceded by a particular list of electronics.[43]

In other cases, we have found to be insufficiently particular language in a warrant permitting the search for "'additional stolen property.'"[44] We have also found insufficiently particular language permitting the personal search of any "'John and/or Jane DOE'"[45] present during a residential search.

### (i) Paragraph 1: Venue Items

We disagree with Jennings' argument that the warrant provision allowing for the search and seizure of "[v]enue items identifying those parties who either own or who are in control of the residence" is too broad to satisfy the particularity requirements set forth above. The facts of the case demonstrate that there was a need for law enforcement to be able to establish a link between items found at the address and Jennings. Similarly to our finding in *Tyler*, we find that the venue items provision is sufficiently particular in light of the nature of the activity under investigation.[46]

Although "[v]enue items" in the warrant at issue described a category of items, rather than a specific item to be seized, that does not mean paragraph 1 violates the particularity

---

[43] *Id.* at 277, 854 N.W.2d at 625.

[44] *State v. LeBron*, 217 Neb. 452, 457, 349 N.W.2d 918, 922 (1984).

[45] Compare *State v. Pecha*, 225 Neb. 673, 676, 407 N.W.2d 760, 763 (1987), with *State v. Johnson*, 243 Neb. 758, 502 N.W.2d 477 (1993).

[46] *State v. Tyler, supra* note 35.

requirements of the Fourth Amendment. The description sets forth objective standards by which executing officers can differentiate items subject to seizure from those that are not. It is the nature of venue items that they cannot be predicted with specificity. Law enforcement understands that items containing an address linked with the suspect's name are indicative of venue. The items that can be seized pursuant to such a venue items clause are clearly only those items which on their face establish ownership, occupancy, or control of the location being searched.

Photographs of the items admitted under paragraph 1 included a cell phone replacement claim, an energy bill, a Social Security card, a credit card billing envelope, and a tax form. Each item had the common trait of containing a shipping label demonstrating that Watt or Jennings received mail and used the North 60th Street address as their residence. The warrant was not constitutionally deficient based on paragraph 1, and the denial of Jennings' motion to suppress as it relates to exhibits 390 through 398 seized and admitted as venue items was properly denied.

### (ii) Paragraph 2: Cell Phones

Paragraph 2, in contrast, has multiple deficiencies under the particularity provision of the Fourth Amendment. It states:

> The ability to seize and process item(s) of evidentiary value, to include: cellular phone(s), computer(s) recording device(s) including audio and video, companion equipment, records, whether stored on paper, magnetic media such as tape, cassette, disk, diskettes, or on memory storage devices such as optical disks, programmable instruments such as telephones, "electronic address books", or any other storage media, together with indicia of use, ownership, possession or control of the aforementioned residence[.]

First, the entire paragraph is grammatically vague. It is unclear how the first clause relates to the second clause listing electronic items. It is equally unclear why the paragraph ends with

a clause discussing "indicia of use, ownership, possession or control." Second, the warrant provides no indication of what it means to "seize and process item(s) of evidentiary value." It is unclear if that statement is limited to the list of specific electronic media that follows or leaves the search and seizure of items to the discretion of the executing officers. For these reasons, we find the statement, "[t]he ability to seize and process item(s) of evidentiary value, to include: . . ." to be unconstitutionally vague.

[13] However, this does not end our inquiry, insofar as the paragraph also listed particular items to be seized. Absent a showing of pretext or bad faith on the part of the police or the prosecution, valid portions of a warrant are severable from portions failing to meet the particularity requirements.[47]

Paragraph 2 contained a sufficiently particular list of specific electronic media items that included cell phones. This list is severable from the insufficiently particular language contained in the first clause of the paragraph. The probable cause provided by the affidavit supported looking for electronic records that could contain information that establishes ownership, occupancy, or control over the residence being searched. The search for and seizure of the specifically listed electronic items did not violate Jennings' Fourth Amendment rights. Thus, the two cell phones were properly seized and the picture of a specific cell phone was properly admitted into evidence as exhibit 406.

### (iii) Paragraphs 4 and 6: Masks and Gloves

Paragraphs 4 and 6 specified certain clothing items to be searched for and seized. The detail provided in the warrant was based on the descriptions of the intruders provided by victims Kimberly and Seth. Photographs were taken of latex gloves and gardening gloves pursuant to paragraph 6. In addition, a box of latex gloves was physically seized pursuant to

---

[47] See *State v. LeBron, supra* note 44. See, also, *U.S. v. Sigillito, supra* note 35.

paragraph 6. These photographs and the box of gloves were admitted into evidence as exhibits 352 through 356 and 528. Photographs of masks found in the residence were taken under paragraph 4 and entered into evidence as exhibits 361 through 365. Jennings does not claim on appeal that either of these paragraphs violated the particularity requirements of the U.S. and Nebraska Constitutions. As such, the motion to suppress was correctly denied as to exhibits 352 through 356, 361 through 365, and 528.

### (iv) Paragraph 5: Clothing Items

Paragraph 5 provided for a categorical search for clothing followed by a list of the specific items described in the affidavit. Photographs of several clothing items were taken under this paragraph and admitted into evidence as exhibits 376 through 386. Exhibits 376 through 379, 385, and 386 were properly admitted as items specifically described in paragraph 5. Thus, we find that the motion to suppress was correctly denied as to exhibits 376 through 379, 385, and 386.

Not including the photographs of the items particularly listed in the warrant as discussed above, 56 additional photographs of the interior of the residence were admitted into evidence. These photographs depicted the general condition of the residence prior to the search. Included in the set of photographs were pictures of the retail boxes for two cell phones and two shirts that were hanging on a laundry rack in a utility room.

Jennings argues that these items were seized pursuant to the insufficiently particular clause "[c]lothing items," which is similar to the clause authorizing seizure of "'footwear [and] clothing" which the 10th Circuit has held violates the particularity requirements of the Fourth Amendment.[48] Assuming without deciding that the admission of these photographs violates the particularity clause, we find their admission to be harmless error.

---

[48] See *U.S. v. Sells, supra* note 36, 463 F.3d at 1152.

[14-17] Harmless error jurisprudence recognizes that not all trial errors, even those of constitutional magnitude, entitle a criminal defendant to the reversal of an adverse trial result.[49] It is only prejudicial error, that is, error which cannot be said to be harmless beyond a reasonable doubt, which requires that a conviction be set aside.[50] When determining whether an alleged error is so prejudicial as to justify reversal, courts generally consider whether the error, in light of the totality of the record, influenced the outcome of the case.[51] In other words, harmless error review looks to the basis on which the jury actually rested its verdict. The inquiry is not whether in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the actual guilty verdict rendered was surely unattributable to the error.[52] Overwhelming evidence of guilt can be considered in determining whether the verdict rendered was surely unattributable to the error, but overwhelming evidence of guilt is not alone sufficient to find the erroneous admission of evidence harmless.[53]

The photographs of the shirts appear to be relevant in that the shirts are similar to clothing worn by the individual in the Raising Cane's restaurant surveillance video. The pictures of the cell phone boxes showing serial numbers were never linked to any element of the crime and appear to have no evidentiary value; thus, no prejudice resulted from their admission. And, given the body of overwhelming evidence of guilt properly admitted, the jury's verdict was surely unattributable to the two shirts.

Excluding these 56 photographs, the jury was presented with a large body of evidence upon which it could base the verdicts. DNA evidence on the Texas toast showed a major

---

[49] *State v. Thompson, supra* note 9.

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *State v. Britt*, 293 Neb. 381, 881 N.W.2d 818 (2016).

contributor profile that matched Jennings' DNA information saved within the CODIS system. Subsequent comparison of the swab taken from the Texas toast to a buccal swab taken from Jennings after he was arrested indicated that Jennings was the probable major contributor of the DNA found at the Brinkman residence. The probability of a random individual's matching a DNA profile found within the major component of the mixture given that Jennings expresses such a profile is approximately 1 in 123 octillion. Jennings' CSLI data placed his cell phone near the area of the crime both before and after the time of the murder. The white Durango was traced to Watt, and Watt subsequently gave a statement to Omaha police indicating that she lent the vehicle to Jennings. Moreover, the Bluetooth records from the Durango showed Jennings' cell phone was connected to the Durango several times throughout the rental period. Further, the CSLI for Watt and Jennings placed both of their cell phones in the area of the Raising Cane's restaurant in Council Bluffs during the same timeframe the surveillance video shows a white Durango go through the drive-through lane.

The jury's verdicts were surely unattributable to the admission of the photographs taken of the Jennings' residence before the search. Accordingly, the admission of such evidence was harmless error.

## VI. CONCLUSION

We find that the district court correctly denied both motions to suppress. The cell phone records and CSLI were properly admitted as a part of the good faith exception to the exclusionary rule. The affidavit provided probable cause for the issuance of a warrant to search the North 60th Street residence. The material evidence found from the search of the residence was properly admitted under sections of the warrant that were constitutionally valid. The balance of the evidence admitted was harmless error even if it were determined to be inadmissible. We affirm the judgment of the district court.

Affirmed.