Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/16/2023 09:05 AM CDT

State of Nebraska, appellee, v.
Majdal K. Elias, appellant.
___ N.W.2d ___

Filed June 16, 2023.    No. S-22-443.

1. **Rules of Evidence: Other Acts: Appeal and Error.** An appellate court reviews for abuse of discretion a trial court's evidentiary rulings on the admissibility of a defendant's other crimes or bad acts under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2022), or the applicability of the inextricably intertwined doctrine.

2. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

3. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.

4. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

Appeal from the District Court for Lancaster County: Lori A. Maret, Judge. Affirmed.

Chad Wythers, of Wythers Law Firm, for appellant.

Michael T. Hilgers, Attorney General, and Stacy M. Foust for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Heavican, C.J.

## INTRODUCTION

Following a jury trial, Majdal K. Elias was convicted of second degree murder, unlawful discharge of a firearm, and two counts of use of a weapon to commit a felony. On appeal, Elias challenges the admission of evidence that he had been the victim of a robbery in the past, had conducted drug deals after the murder, and had possessed several weapons. Elias further challenges cellular telephone information obtained from a "tower dump." We affirm.

## BACKGROUND

*Shooting and Police Investigation.*

The charges against Elias stem from the shooting death of Ali Alburkat on September 29, 2019. Alburkat was a back seat passenger in a car that was shot at during a drive-by shooting on North 7th Street near the Links, an apartment complex north of Interstate 80, in Lincoln, Nebraska.

Alburkat, who was 15 years of age, and three others had been driving around the parking lot of the Links, searching for the apartment of a drug dealer they had planned to rob. The driver of the car in which Alburkat was a passenger had taken his shirt off and wrapped it around his head to mask his identity. A silver or gray Ford Explorer began following them. The two vehicles stopped on North 7th Street so that the occupants could confront each other, and the driver (and sole occupant) of the Explorer asked the other driver about his "mask" and then said something about the occupants of the car being "busted" before shooting at the car as the Explorer sped away. Alburkat died from a gunshot wound to his back,

later determined to be inflicted by a 9-mm Glock handgun. The weapon used to kill Alburkat was never recovered.

Police obtained surveillance footage from security cameras in the vicinity, which showed the Explorer involved in the shooting. In early October 2019, officers canvassed the nearby Links apartment complex and located a similar Explorer, complete with distinctive damage to its "air dam" and registered to Elias.

By mid-October 2019, a narcotics task force had, coincidentally, learned that Elias was potentially involved in dealing large amounts of marijuana and possibly cocaine around Lincoln. Several controlled narcotics buys were facilitated between Elias and a confidential informant. Prior to two of those buys, Elias visited a residence owned by his aunt and uncle. According to the testimony of that aunt, Elias stored marijuana at their home and had also done so at their prior home.

Another aunt lived with Elias at the Links and had also lived with Elias previously at a different apartment complex in Lincoln. According to this aunt, Elias had moved drugs and other items stored at his aunt and uncle's prior home into a garage located at her and Elias' apartment complex, which was then burglarized at a loss of approximately $60,000.

After these controlled buys, search warrants were sought for Elias' apartment, as well as for his aunt and uncle's home. During those searches, large amounts of narcotics, firearms, and currency were found. Elias was charged separately for the drug offenses and convicted. Following the arrest of Elias in late October 2019, which was reported in the news media, the driver of the car in which Alburkat had been a passenger informed law enforcement that he believed Elias could be the shooter.

In addition to the identification of Elias and the match of Elias' Explorer to the Explorer driven by the shooter, law enforcement also obtained a court order under 18 U.S.C. § 2703(d) (2018) and the Nebraska equivalent, Neb. Rev.

Stat. § 86-2,106 (Reissue 2014), for a "tower dump." Tower dumps include phone numbers for all cell phones that accessed towers near a requested address during a particular timeframe.

This information was obtained within a few days of the shooting. The requesting officer testified at the hearing on the motion to suppress that because the information was not retained by cell phone carriers for more than 10 or so days, it needed to be obtained as soon as possible, even though it might not be needed for a period of time.

Once Elias was arrested, law enforcement was able to search for his phone number in this data. In doing so, it was determined that Elias was in the vicinity of North 7th Street during the same time as the cell phone locations of the victims of the shooting. Moreover, the evidence produced from the tower dump was consistent with the surveillance video obtained from the security cameras near the scene of the shooting.

The State's theory of the defense was that Elias had previously lost $60,000 in a burglary and was concerned that the occupants of Alburkat's car were at the Links to rob him. Elias was charged with second degree murder, unlawful discharge of a firearm, and two counts of use of a firearm to commit a felony.

*Pretrial Motions.*

Prior to trial, Elias filed several motions in limine and a motion to suppress. As to the motions in limine, Elias asked the district court to exclude, on the basis of Neb. Evid. R. 404, Neb. Rev. Stat. § 27-404 (Cum. Supp. 2022) (Rule 404), all evidence related to his attempted purchase of a murder weapon, his possession of other weapons, and any evidence that he was distributing illegal narcotics. Following a hearing, the district court concluded that the evidence was relevant to Elias' motive for the shooting—his concern about being burglarized or robbed—and further found that the State had proved by clear and convincing evidence that events surrounding the drug and gun possession evidence sought to be excluded did occur.

In his motion to suppress, Elias sought the suppression of the data obtained from the tower dump of the cellular towers near the location of the shooting. Following a suppression hearing, the district court also denied the motion to suppress, stating:

> Based on the evidence presented here today, I do find that specifically with regard to the tower dump, I find it illustrative and compelling that in Carpenter versus United States the court, as [counsel for the State] has pointed out, specifically states, "We do not express a view on matters not before us, real time, [cell site location information] or tower dumps." Specifically, I think that's what we have here.
>
> I also find that tower dumps—I mean, the Fourth Amendment is supposed to protect a person's right to privacy. It doesn't mean that you're not doing something behind the closed door of your bedroom, it just means that I can't find out what that is. And, when the tower dump was applied for and received, there was nothing identifying, in that information, that would have told anybody, without further information, that any of that information from that tower dump belonged to . . . Elias. In a sense, the door to that bedroom was closed and it remained closed until additional evidence was gathered that allowed that first investigative tool to become useful.
>
> I find that having not done that tower dump, that that information would have disappeared and law enforcement wouldn't have been able to have used that, which is the reason we have the state statute and the federal statute giving law enforcement that additional tool of being able to locate, find, bring to just[ice] those persons who are committing crimes.
>
> At the time of the tower dump, the defendant wasn't even a person of interest.

It's very fact specific. Carpenter is, and I'm going to
overrule the motion to suppress.

Following a jury trial, Elias was convicted of second degree
murder, unlawful discharge of a firearm, and two counts of
use of a weapon to commit a felony. He was sentenced to
60 to 80 years' imprisonment for second degree murder, 10
to 20 years' imprisonment for unlawful discharge of a fire-
arm, and 10 to 20 years' imprisonment on each count of use
of a weapon to commit a felony, with all sentences to be
served consecutively.

## ASSIGNMENTS OF ERROR

Elias assigns that the district court erred in (1) admitting
evidence of his character, specifically information that (a) he
conducted drug deals after the murder, (b) he was the victim
of a robbery, and (c) he owned firearms, and (2) holding that
the cell phone tower dump was not a search and subject to the
protections of the Fourth Amendment.

## STANDARD OF REVIEW

[1] An appellate court reviews for abuse of discretion a trial
court's evidentiary rulings on the admissibility of a defendant's
other crimes or bad acts under Rule 404(2) or the applicability
of the inextricably intertwined doctrine.[1]

[2,3] In proceedings where the Nebraska Evidence Rules
apply, the admissibility of evidence is controlled by such
rules; judicial discretion is involved only when the rules
make discretion a factor in determining admissibility.[2] Where
the Nebraska Evidence Rules commit the evidentiary ques-
tion at issue to the discretion of the trial court, an appellate
court reviews the admissibility of evidence for an abuse
of discretion.[3]

---

[1] See *State v. Lee*, 304 Neb. 252, 934 N.W.2d 145 (2019).

[2] *Id*.

[3] *Id*.

[4] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review.[4] Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.[5]

## ANALYSIS

*Rule 404.*

In his first assignment of error, Elias assigns that the district court erred in (1) admitting evidence of his character, specifically information that (a) he conducted drug deals after the murder, (b) he was the victim of a robbery, and (c) he owned firearms.

Elias timely challenged the preceding evidence under Rule 404. A hearing under Rule 404(3) was held, after which the court, applying the applicable clear and convincing evidence standard, concluded that the events in question had occurred and were admissible to show Elias' motive for the shooting that led to Alburkat's death.

The State argued, and the court found, that Elias had previously been the victim of a burglary and currently possessed large sums of money and large quantities of illegal narcotics. Elias owned multiple weapons, and the State posited that Elias was concerned that Alburkat's car posed a threat to him, particularly given that the car and its occupants were driving around the parking lot of the Links apartment complex (because they were apparently lost) and with a driver who had a shirt wrapped around his face in a makeshift mask (because they apparently intended to rob someone else).

---

[4] *State v. Jennings*, 305 Neb. 809, 942 N.W.2d 753 (2020).

[5] *Id.*

At trial, the State offered the testimony of a law enforcement officer who helped execute the search warrants in Elias' case. Elias objected to the content of the officer's testimony in connection with the motion in limine. Specifically, the officer testified that on at least two occasions, Elias had engaged in the sale of illegal narcotics to a police informant, and that several search warrants were executed with respect to Elias' home, another home that Elias had continuing access to, and Elias' car. The officer testified that during the execution of the warrants, illegal narcotics, cash, and multiple firearms were discovered.

At the time the officer began to testify, Elias sought and was granted a continuing objection to the testimony. Following the officer's testimony, at least seven other witnesses also testified that Elias owned multiple firearms or that large quantities of illegal narcotics were found in Elias' home, as well as in areas under Elias' control in his aunt and uncle's home. Elias failed to object to any of that testimony or other evidence.

Neb. Rev. Stat. § 25-1141 (Reissue 2016) provides:

> Where an objection has once been made to the admission of testimony and overruled by the court it shall be unnecessary to repeat the same objection to further testimony of the same nature by the same witness in order to save the error, if any, in the ruling of the court whereby such testimony was received.

We addressed a similar situation in *State v. Castillas*[6]; there, the defendant sought and obtained a "continuing objection" during the direct examination of three witnesses, but failed to object or renew his objection during the testimony of a fourth. We held that under § 25-1141, the defendant had waived his objection to the testimony at issue.

---

[6] *State v. Castillas*, 285 Neb. 174, 182, 826 N.W.2d 255, 263 (2013), *disapproved on other grounds, State v. Lantz*, 290 Neb. 757, 861 N.W.2d 728 (2015). See, also, *State v. Pope*, 305 Neb. 912, 943 N.W.2d 294 (2020).

In the same way, Elias' objection, on the basis of Rule 404, was timely as to the initial testimony, and a continuing objection was sought. But in order to preserve the objection to the evidence at issue, that objection needed to be renewed with each new witness. It was not. As such, Elias has waived his objection to the evidence as presented through the testimonies of the other witnesses.

But even if Elias had preserved that objection, we would find no error in the admission of the challenged testimony. The evidence in question—Elias' status as the victim of a robbery, Elias' actions in selling illegal narcotics, and Elias' ownership of firearms—was challenged by a motion in limine filed by Elias on the basis of Rule 404. Rule 404(2) states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

As noted above, a hearing was held at which the State offered evidence in which the district court determined the State had proved, by clear and convincing evidence, that the "crime[], wrong[], or act[]" had been committed by Elias and that the evidence was admissible to show Elias' motive. Moreover, the jury was instructed to this effect prior to its deliberations.

Elias challenges the admissibility of that evidence to prove his motive. He contends that the evidence of the postmurder drug deals was insufficient evidence of the existence of a motive to shoot someone, especially where that murder occurred prior to the drug deals offered into evidence. Elias further argues that assuming his status as the victim of a burglary could have motivated him to seek out retaliation, that motivation was not dependent on whether he was a drug dealer or on what was stolen. Finally, Elias argues that his possession of firearms only encourages the jury to conclude

that he is a drug dealer who owns guns and therefore must be punished.

We disagree that this evidence was not relevant to show Elias' motive. The State's theory was that Elias was suspicious of Alburkat and his companions because of Elias' own experiences, namely that he had been burglarized of about $60,000 in property. The State asserted that Elias, because of his drug dealing, was in control of significant amounts of cash and narcotics and that further, he possessed guns, including one in a magnetic box affixed to the bottom of his vehicle, because he was concerned about becoming a victim, yet again, of a burglary. Elias' arguments in opposition are unpersuasive.

There is no merit to Elias' first assignment of error.

*Cell Tower Dump.*

Elias next assigns that the district court erred in denying his motion to suppress data obtained via the warrant for a tower dump. We conclude that on these facts, the tower dump in question was not a search. As such, this assignment of error is likewise without merit.

A tower dump is "a download of information on all the devices that connected to a particular cell site during a particular interval."[7] Our analysis of the propriety of a tower dump must begin with the U.S. Supreme Court's decision in *Carpenter v. U.S.*[8] *Carpenter* held that individuals do have a reasonable expectation of privacy in the record of physical movements captured by cell site location information (CSLI) and that a warrant supported by probable cause generally must be obtained in advance of law enforcement acquiring such records.[9]

---

[7] *Carpenter v. U.S.*, ___ U.S. ___, 138 S. Ct. 2206, 2220, 201 L. Ed. 2d 507 (2018).

[8] *Carpenter, supra* note 7.

[9] *Id.* See *State v. Brown*, 302 Neb. 53, 921 N.W.2d 804 (2019).

In reaching its conclusion, the Court in *Carpenter* expressed concerns over the voluminous nature of the location data at issue there—noting that such data "provides an all-encompassing record of the holder's whereabouts[, and such] time-stamped data provides an intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.'. . . These location records 'hold for many Americans the "privacies of life."'"[10] But the Court also noted that its decision was a "narrow one" and did not "express a view on matters not before us: real-time CSLI or 'tower dumps.'"[11]

Factual scenarios similar to Elias' were presented by *United States v. Walker*[12] and *United States v. Rhodes*.[13] In *Walker*, the court distinguished *Carpenter*, noting:

> Here, the orders capture [CSLI] not for one targeted individual for an extended time, chronicling that individual's private life for days, but rather capture [CSLI] for a particular <u>place</u> at a <u>limited time</u>. In this manner, the privacy concerns underpinning the court's holding in <u>Carpenter</u> do not come into play here, where the search for data focuses not on "the whole of [an individual's] physical movements" but rather on the data that was left behind at a particular time and place by virtue of cell phone tower locations. . . . Instead, the [CSLI] tower dump information gathered here is more akin to "conventional surveillance techniques" and tools, such as security cameras and fingerprint collections, which capture data from <u>every</u> individual who came into contact

---

[10] *Carpenter, supra* note 7, 138 S. Ct. at 2217.

[11] *Id.*, 138 S. Ct. at 2220.

[12] *United States v. Walker*, No. 2:18-CR-37-FL-1, 2020 WL 4065980 (E.D.N.C. July 20, 2020).

[13] *United States v. Rhodes*, No. 1:19-CR-73-AT-LTW, 2021 WL 1541050 (N.D. Ga. Apr. 20, 2021).

with the crime scene in the manner revealed by the technology at issue. . . .

In light of the significant differences between a tower dump [CSLI] and long term CSLI targeted at the whole of an individual's movements, as highlighted by the court's decision in <u>Carpenter</u>, the court finds no basis for attaching a Fourth Amendment interest to tower dump [CSLI].[14]

And in *Rhodes*:

The Government's application sought identifying information for all phones within the radius of twelve different towers on twelve separate days for specific, limited identified hours as well as the telephone numbers each of those phones called or were called by, the date, time, and duration of each communication and the type of communication (*i.e.*, whether text or phone call). The twelve identified cell towers serviced cell phone communications made in the radius of the commercial sites where the robberies at issue had occurred in the time frame between October 19, 2017 and July 28, 2018 in metropolitan Atlanta. At the time that the Government pursued this application, it already had collected a significant amount of information regarding the common patterns identified in the robberies conducted by one or more individual suspects who appeared to frequently be using a silver Nissan car for transportation. . . .

Data on calls made by hundreds of individuals from the cell tower dumps was collected in the process of the Government's search for information that might be of assistance in the Government's investigation and identification of the suspect(s) who may have committed the robberies. The Magistrate Judge found that "the cell site information collected by the Government here merely showed the location at which a device

---

[14] *Walker, supra* note 12, 2020 WL 4065980 at *8.

accessed a cellular network at a particular time" to determine if it "corresponded with the dates, times, and locations of the robberies." . . . The information collected did not track Defendant's or others' movements in detail over a lengthy period of time or the substance of their communications.

. . . .

. . . The specific facts presented in this matter portray a sufficiently limited investigation and intrusion; the Court concludes that the Government did not need a warrant to obtain the information at issue. The Court specifically declines to reach the question of whether this would be true in connection with other applications for cell tower dumps.[15]

As was true in *Walker* and *Rhodes*, this case is distinguishable from *Carpenter*. The concerns present in *Carpenter*—where law enforcement had access to well over 100 days of CSLI data, including almost 13,000 location points cataloging the defendant's movements, averaging 101 data points per day—are not present here. The data at issue here captured a single snapshot of data at a limited place—the cell phone tower nearest to the scene of the shooting—and for a limited time—just 30 minutes total, beginning 15 minutes prior to the shooting and ending 15 minutes after—arguably narrower even than the data obtained in *Walker* and *Rhodes* and, particularly in light of its use in conjunction with security footage from surrounding properties, more akin to "conventional surveillance techniques," as referenced by the court in *Walker*.

*Good Faith.*

Even if this tower dump implicated the Fourth Amendment, we find that the order under 18 U.S.C. § 86-2,106 allowing the dump was executed in good faith. Application of the good faith exception to the exclusionary rule is a question of

---

[15] *Rhodes, supra* note 13, 2021 WL 1541050 at *1-2.

law.[16] The U.S. Supreme Court has explained that to trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter such conduct and sufficiently culpable that such deterrence is worth the price paid by the justice system, because exclusion serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances, recurring or systemic negligence.[17] The good faith exception is applicable to an affidavit that fails to satisfy the substantial basis test to support probable cause, when police officers act in objectively reasonable good faith in reliance upon the warrant.[18]

The good faith inquiry is confined to the objectively ascertainable question of whether a reasonably well-trained officer would have known that the search was illegal despite a magistrate's authorization.[19] In assessing the good faith of an officer's conducting a search under a warrant, an appellate court must look to the totality of the circumstances surrounding the issuance of the warrant, including information not contained within the four corners of the affidavit.[20] When evaluating whether the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, an appellate court should address whether the officer, considered as a police officer with a reasonable knowledge of what the law prohibits, acted in objectively reasonable good faith in relying on the warrant.[21]

"If the reviewing court is 'able to identify in the averring officer's affidavit *some* connection, regardless of

---

[16] *State v. Short*, 310 Neb. 81, 964 N.W.2d 272 (2021).

[17] *Herring v. United States*, 555 U.S. 135, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009).

[18] *Short, supra* note 16.

[19] *Id*.

[20] *Id*.

[21] *Id.*

how remote it may have been'—'some modicum of evidence, however slight'—'between the criminal activity at issue and the place to be searched,' then the affidavit is not bare bones and official reliance on it is reasonable."[22]

The affidavit in support of the order seeking the tower dump contained "some modicum of evidence" between the shooting near the Links apartment complex and the request for a tower dump of the cell tower nearest that scene. In its affidavit, law enforcement averred the current state of the law on these types of requests. And, while some CSLI is entitled to protection under the Fourth Amendment, the U.S. Supreme Court has not spoken with respect to the facts presented by this case. In this respect, we see obvious parallels between this case and *State v. Brown*.[23] There, we applied the good faith exception in a case where the State, before *Carpenter* was issued, obtained CSLI via a court order under the federal Stored Communications Act rather than a warrant. We thus conclude that law enforcement was entirely reasonable in its reliance on the order obtained under 18 U.S.C. § 86-2,106.

We need not and do not opine here on the question of whether a tower dump might, in different circumstances, implicate the Fourth Amendment. But we find it does not apply here. As *Carpenter* reminds us, and as Justice Frankfurter noted in connection with new innovations in airplanes and radios, courts must tread carefully "to ensure that we do not 'embarrass the future.'"[24] Elias' second assignment of error is without merit.

## CONCLUSION

The decision of the district court is affirmed.

AFFIRMED.

---

[22] *Id*. at 135, 964 N.W.2d at 314.

[23] *Brown, supra* note 9.

[24] *Carpenter, supra* note 7, 138 S. Ct. at 2220 (quoting *Northwest Airlines v. Minnesota*, 322 U.S. 292, 64 S. Ct. 950, 88 L. Ed. 1283 (1944)).